IAN T. ALLISON, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Allison v. Commissioner
Docket Nos. 3320-73, 3361-73 3362-73, 3386-73
United States Tax Court
T.C. Memo 1976-248; 1976 Tax Ct. Memo LEXIS 153; 35 T.C.M. (CCH) 1069; T.C.M. (RIA) 760248; August 11, 1976, Filed *153 Acceptance and Investment entered into an agreement to acquire and develop property. A portion of the property was distributed to Acceptance who subsequently through a subsidiary, Mortgage, distributed to each Allison and Krikac, its officers, one of the subdivided lots. Held: There was no provision for sharing profits and losses, Acceptance was entitled (between the parties) to certain property in all events and hence there could be no joint venture; the receipt of the property by Acceptance represents ordinary income for services rendered. Held further: Fair market value of the property determined which fixes Acceptance's basis in the property and the amount of income received by Acceptance, Allison and Krikac. Held further: A portion of Acceptance's claimed advertising expense deduction is limited by sec. 274(b). Acceptance and Mortgage both changed the method by which they computed their deduction for state franchise taxes. Neither sought respondent's approval before making the change. Held: The new method represents a change of accounting method for which the respondent's approval must be received before the change can be implemented. Sec. 446(e). In 1970 Mortgage sold *154 its interest in property to Evergreen and received $50,000 and notes received by Evergreen when it sold portions of the property to third parties. Held: These notes are not evidences of the purchaser's (Evergreen) indebtedness and must be included, at their fair market value, as amounts received in the year of sale. Held further: Mortgage's use of the installment sale method to report this transaction is proper since the $50,000 payment and the fair market value of the third party notes received in 1970 is less than 30 percent of the sales price. Charles M. Giovanetti and John E. Mahoney, for the petitioners. James H. Ross, Jr., for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: The respondent determined deficiencies in petitioners' federal income tax as follows: Docket No.
Petitioner
Year
Deficiency
3320-73
Ian T. Allison
1969
$ 624.17
1970
3,431.58
3361-73
Lumbermans Acceptance Company
1969
167,707.88
1970
88,724.81
3362-73
Lumbermans Mortgage Company
1966
$ 977.58
1967
2,079.58
1969
38,080.76
1970
86,887.37
3386-73
Stanley D. Krikac and Mary F.
1970
1,069.00
Krikac Upon petitioners' motion, to which respondent had no objection, these cases were consolidated for trial, *155 briefs and opinion. Several of the issues raised by the respondent in his deficiency notice have been settled, one by concession by respondent in his reply brief. Several of the remaining issues are either common to more than one docket or are determinative of the issues in other dockets. In docket number 3361-73 the primary issue is a determination of the relationship, and the accompanying income tax consequences, between Lumbermans Acceptance Company and McCoy Investment Company, Inc. with respect to their activities involving the acquisition, development and disposition of the Goose Lake Estates lots. Inherent in this issue is a possible reallocation of income pursuant to section 482 on the transfer by Lumbermans Acceptance Company to its subsidiaries, and the subsequent sale by the latter to third parties of some of the lots, and a determination of the fair market value of the Goose Lake Estates lots. Also at issue in this docket is whether a portion of the amount claimed as advertising expenses is subject to the $25 limitation imposed by section 274(b). At issue in both docket numbers 3361-73 and 3362-73 is whether the respective petitioners may change the method by which *156 they calculated their deductions in both 1969 and 1970 for state franchise taxes. The primary issue in docket number 3362-73 is whether Lumbermans Mortgage Company may report the gain realized on the sale of its interest in the Wildlife Estates as an installment sale or a deferred sale, or whether the gain realized must be recognized in 1970. The deficiencies determined by respondent for 1966 and 1967 in docket number 3362-73 relate solely to the current disallowance of a net operating loss previously allowed by the respondent which was reported by Lumbermans Mortgage Company for 1969 and carried back to 1966 and 1967. This loss is now subject to the adjustments determined by the respondent. The resolution of this matter awaits the final determination of the issues currently in controversy for 1969. The remaining issue and the sole issue in docket numbers 3320-73 and 3386-73, respectively, is the value of a Goose Lake Estates lot received in 1970 for services rendered by Ian T. Allison, and Stanley D. Krikac, respectively, in connection with the above mentioned Goose Lake Estates venture. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation *157 of facts, together with the exhibits attached thereto, are incorporated by this reference. Petitioner Ian T. Allison (hereinafter Allison) is an individual who resided in Santa Rosa, California at the time he filed his petition herein. Allison filed his 1970 individual federal income tax return with the district director of internal revenue, San Francisco, California. Petitioner Lumbermans Acceptance Company (hereinafter Acceptance) is a California corporation that had its principal place of business in Santa Rosa, California at the time it filed its petition herein. Acceptance filed its 1969 and 1970 corporate federal income tax returns with the district director of internal revenue, San Francisco, California. Petitioner Lumbermans Mortgage Company (hereinafter Mortgage) is a California corporation that had its principal place of business in Santa Rosa, California at the time it filed its petition herein. Mortgage filed its 1966, 1967, 1969 and 1970 corporate federal income tax returns with the district director of internal revenue, San Francisco, California. Petitioners Stanley D. Krikac (hereinafter Krikac) and Mary F. Krikac are husband and wife who resided in Santa Rosa, *158 California at the time they filed their petition herein. Petitioners filed their 1970 joint federal income tax return with the district director of internal revenue, San Francisco, California. Acceptance during the taxable years in issue owned 100 percent of the outstanding common stock of Mortgage, which however was in a minority dollar value to the issued and outstanding preferred stock which was owned by approximately 140 unrelated persons. Mortgage's common stock contained 100 percent of the voting power as long as dividends on the preferred stock were not in arrears 24 months. The preferred shareholders have never exercised their voting power. [2] *159 Acceptance also during the taxable years in issue and until 1971 owned 100 percent of the outstanding stock of Loomis Wine Cellars, an entity that was formerly known as Lumbermans Leasing Company. During 1970 the corporate name change was effected. For convenience this entity will hereinafter be referred to as Loomis. Acceptance is licensed as a personal property loan broker to deal in commercial finance. Its practice involved participation in projects that required financial expertise. Mortgage is a real estate brokerage firm whose primary business activity is to finance the procurement and development of real property and the purchase of notes at discounts. During all times relevant to this proceeding Acceptance and Mortgage kept their books of account on the accrual basis of accounting. Allison and Krikac were president and vice-president, respectively, of Acceptance and its subsidiaries. Allison also is a licensed public accountant and real estate broker. Allison, acting on behalf of Acceptance, and James McCoy (hereinafter McCoy), a real estate broker and president of McCoy Investment Company, Inc. (hereinafter Investment), a *160 real estate holding company, became interested in developing land in northern California known as the Goose Lake property (hereinafter Goose Lake or the property). Allison and McCoy had previously investigated other prospective parcels when they learned of the availability of the property in the middle of 1969. The property consisted of 440 acres, more or less, on the Oregon border in Modoc County, California. Allison and McCoy conferred with respect to the project and they proposed to divide the property into individual lots for resale. McCoy made an offer for the property and in September, 1969 an exchange agreement was reached between the seller and Investment. Under the terms of the agreement Investment was to exchange land plus $80,000 for the Goose Lake property. After this agreement was executed Allison and McCoy had additional conferences concerning the manner in which the property would be developed. These discussions led to a document executed by the parties in October, 1969 that established certain rights and obligations between them. The agreement provided in relevant part: Lumbermans Acceptance Company, a California corporation hereinafter referred to as LAC, and *161 McCoy Investment Co., Inc., hereinafter referred to as McCoy, hereby enter into a joint venture for the limited purpose and in accordance with the specific terms, conditions and agreements as set forth below. Project: To purchase the present Robnett Ranch at Goose Lake in Modoc County, California, consisting of 440 acres, for the purpose of forming a 200 two-acre lot subdivision known as Goose Lake Estates. Duties and Obligations of LAC: LAC will provide $53,000.00 in a loan in a form and manner set forth in separate loan agreement. Said loan agreement is attached to and made part of this agreement. This loan will be a direct loan from LAC to McCoy, but will only be made by LAC if it meets all loan policy requirements of LAC and their rediscount lenders. LAC is not obligated to provide said loan if terms of their loan policy or rediscount lenders cannot be met. LAC will arrange on a best efforts basis to obtain a bank loan for McCoy on the 440 acre Robnett Ranch in the sum of Eighty Thousand Dollars ($80,000.00) to be executed by McCoy and to be secured by a 1st Deed of Trust on said property. Duties and Obligations of McCoy: It will be the sole obligation and expense of McCoy *162 to purchase the Robnett Ranch and to subdivide the approximately 440 acres under the State Subdivision Law. McCoy will convey a lot located in Santa Rosa, California, to Robnett Ranch Co., Inc., as a downpayment. McCoy is to construct all roads, complete all surveying for lot map to be recorded, set all monuments at his own expense, together with any and all expenses required to complete the formation of 200 two-acre parcels to be known as Goose Lake Estates. McCoy is required to obtain a public report from the Division of Real Estate to comply with the Subdivision Law requirements to enable immediate public sale of the 200 lots. All fees, legal expense, printing costs, and any other expenses meeting these requirements are at the sole expense of McCoy. Division and Distribution: Upon recording of final subdivision map, for and in consideration of the efforts, services and liabilities specifically assumed by LAC, 75 lots of Goose Lake Estates will be deeded to LAC free and clear of any encumbrances except rights of way of record as per schedule of lots attached hereto and made part of this agreement. * * *
Residual Property. Upon filing of final subdivision map, any excess land *163 not subdivided, namely Goose Lake frontage, duck ponds, interest under life estate, 80 acres in section 36, Oregon residence, Highway 395 frontage, and any lots developed in excess of the planned 200 lots in Goose Lake Estates, will be deeded into Goose Lake Rod and Gun Club, a joint venture between McCoy Investment Company and LAC which may be incorporated upon mutual agreement of the parties thereto. * * *
Upon distribution of the lots and recording of the same in the respective names designated herein, this Joint Venture Agreement will be terminated, but the other agreements attached hereto will remain in effect. The transaction was closed in November, 1969 with the seller deeding the property to Investment. The $80,000 portion of the consideration was obtained through a loan by Investment from the Sierra National Bank with the property serving as collateral. Pursuant to their agreement Acceptance with Mortgage's assistance arranged for the above loan and also provided the $53,000 to cover closing costs and costs of the initial phase of the property's development. Investment evidenced the latter amount by executing a promissory note to Acceptance secured by the property. During *164 1969 Acceptance incurred capitalized costs of $10,000 with respect to its performance of the agreement. The subdivision map shows that the property contained 202 lots and several portions of undivided residual property. The residual property consisted of 80 acres of hillside property, 2 commercial lots (not shown on the subdivision map), 20 acres of lake frontage, lots 77 and 181 of the subdivision, a 5 acres life estate, a parcel known as greenhouse-Oregon, and certain farm equipment. The official plat for the property was filed on December 18, 1969 and on that date, pursuant to their agreement, Investment deeded to Acceptance 75 lots in the subdivision. This deed was recorded on December 18, 1969. Acceptance did not report any income in 1969 from the receipt of the lots or the residual property in Goose Lake. On November 30, 1969 Acceptance and Pacific States Builders (hereinafter Pacific States) negotiated a sale of 50 lots in Goose Lakes for $200,000 or $4,000 per lot. These lots were among those Acceptance subsequently received from Investment in December, 1969. Acceptance received $50,000 towards the purchase price on the above date and used the installment method to *165 report the transaction on its 1969 tax return. In 1970, Acceptance received 5 third party purchase money notes, secured by deeds of trust on the same lots sold, in the total face amount of $23,490 as payment toward the selling price. Only the total cash collections received by Acceptance on these notes, including down payments of $81.04, were reported as payments on the installment obligation. On November 30, 1969 Acceptance effected journal entries to record a transfer of 10 lots in Goose Lake to Loomis at the former's cost of $100 per lot. No deed was ever executed with respect to the transfer.These lots were among those Acceptance subsequently received from Investment in December, 1969. On this date Loomis negotiated a sale of these lots to Marie Seckel (hereinafter Seckel) for $35,000 or $3,500 per lot. Journal entries on Acceptance's books indicate that on the same day $20,000 was paid toward the selling price by Acceptance, which had been holding that sum for Seckel's investment. In October, 1969 Acceptance entered into negotiations with Seckel for the purchase by her of 10 lots in Goose Lake. A written agreement was drawn up and signed by both parties. On October 30, *166 1969 $20,000 was applied toward this purchase from funds being held for Seckel by Acceptance. Before the lots were transferred to Seckel, Acceptance transferred them to Loomis who then entered into the sale with Seckel as described above. Also on November 30, 1969 Acceptance effected journal entries to record a transfer of an additional 14 lots in Goose Lake to Mortgage at the former's cost of $100 per lot. No deed was ever executed with respect to the transfer. These lots were among those Acceptance subsequently received from Investment in December, 1969. On this date Mortgage negotiated a sale of 12 of these lots to Archie and Keith Starrett (hereinafter the Starretts) for $44,597.48 or approximately $3,700 per lot. All of these above sales agreements were negotiated before the public report, which was required under California law before the lots could be sold to the public, was obtained. This report was not issued until February 26, 1970. As part of the agreements it was understood that the lots were to be resold at a later date for a higher price and, if that could not be accomplished, the agreements would be cancelled. The lots subject to those agreements were not resold *167 and the agreements did not take effect. After Acceptance received the 75 lots in December, 1969 the parties continued to resolve various problems that arose with respect to the property. Such matters included grading and paving the streets, obtaining the public report, and initiating and developing a sales program. In February, 1970 the parties executed a second agreement that was primarily concerned with the current status of certain accounts and other financial details related to the development of the property. Investment was unable to meets its obligations with respect to the property and in September, 1970 its interests in the property were conveyed to Acceptance. The indebtedness, which was secured by the property, was assumed by Acceptance who subsequently satisfied these debts. The relationship between Acceptance and Investment ended at this time. The events of this relationship were neither recorded in partnership books nor reported on federal or state partnership returns. The Goose Lake property is situated in northern California. It is bordered on three sides by Goose Lake, a main highway, and the Oregon state border and is near several small towns. The surrounding *168 area is rural in nature and is known for its native wildlife and hunting potential. The 75 lots acquired by Acceptance in December, 1969 range in size from 1.3 to 2.0 acres and are in mostly flat to gently sloping land. The property is zoned for rural-residential purposes which is its highest and best use. The record includes valuation reports submitted by the respective parties of the Goose Lake property including the residual property. In 1970 portions of the residual property including the greenhouse-Oregon and the farm equipment were sold for $6,632 and $6,750, respectively. For taxable years prior to 1969 Acceptance deducted its accrued state franchise taxes during a taxable year that related to the preceding taxable year in accordance with the respondent's position as established in Rev. Rul. 68-305, 1968-1 C.B. 213. In 1969 Acceptance changed its method of accounting for this tax and deducted an accrued amount in accordance with the recommendation of an opinion issued by the American Institute of Certified Public Accountants. Acceptance paid in state franchise taxes for 1969, 1970, and 1971 amounts of $2,546.85, $7,230.37, and $7,581.78, respectively. Based on its new *169 accrual method Acceptance deducted on its 1969 and 1970 tax returns as state income taxes amounts of $25,913.58 and $65,274.62, respectively. [3]
For taxable years prior to 1969 Mortgage followed the procedure used by Acceptance with respect to its California state franchise tax liability. In 1969 Mortgage changed its method to the one used by Acceptance. Mortgage paid in state franchise taxes for 1969, 1970 and 1971 amounts of $5,314.04, $213.37 and $2,668.79, respectively. Based on its new accrual method Mortgage deducted on its 1969 and 1970 tax returns as state income tax amounts of $14,299.03 and $10,002.88, respectively. Loomis was in the business of retailing wine under its own label. Acceptance, as 'Loomis' sole owner, was contemplating a public offering of Loomis stock. Several steps were taken towards this objective including the compilation of an offering circular. The amount reported by Acceptance as advertising expense for the taxable year 1970 includes the cost of Loomis wine delivered to various business associates including security dealers, underwriters, and bankers. On *170 January 5, 1970 Mortgage entered into an agreement with Rolan Peterson DBA Evergreen Investment Company (hereinafter Evergreen). This agreement served to detail the obligations of the parties with respect to the purchase, subdivision, and disposition of a 1,000 acre tract known as Wildlife Estates. Mortgage was to take title to the property, provide and arrange for the necessary financing, and complete road improvements. With respect to its financing obligation Mortgage delivered to the sellers a $44,597.48 promissory note and negotiated for Evergreen from Acceptance a $44,000 loan. These amounts were secured by a first and second deed of trust, respectively. Mortgage fulfilled its obligations and took title to the property.Two lots were conveyed to Mortgage as reimbursement for the road work expenses incurred. The lots were resold by Mortgage for a gross sales price of $26,750. Mortgage received cash plus notes totaling $23,500 which were assigned by Mortgage to the sellers to reduce the balance of the first deed of trust. In connection with this sale Mortgage incurred commission and miscellaneous selling expenses of $5,350 and $755.41, respectively, leaving a net sales price *171 of $20,644.59. Pursuant to their agreement Mortgage, in January, 1970, deeded the property to Evergreen and received a noninterest bearing promissory note of $380,000 secured by a deed of trust on the property (hereinafter the Evergreen note). In July, 1970 Mortgage received a cash payment of $50,000 which was applied against the balance due on the Evergreen note. During 1970 Evergreen sold lots to third parties as contemplated by the agreement which resulted in third party purchase money notes secured by deed of trust on these lots. Pursuant to their agreement these notes were delivered to Mortgage who reduced the outstanding balance of the Evergreen note by the face amount of the third party notes, rather than the cash collections thereon. In the event of a default on these third party notes Mortgage debited the Evergreen note account in an amount equal to the unpaid balance thereon. The following schedule reflects the face amounts of the third party notes received by Mortgage and the corresponding credits to the Evergreen note account. Credit To
Face Value
Evergreen Lot #
Purchaser
of Note
[4] Note Account 12
Harris
$ 9,000
$ 7,960
26
Smandra
8,500
8,400
34
Stiewig
11,000
11,500
38
Murray-Powers
9,675
7,960
50
Morris 9,000
9,475
4
Schilt
14,000
12,000
20
Neer
8,760
7,960
21
Harberts
9,000
7,960
7
Reding
9,000
7,960
27
Gray
14,000
12,000
28
Gray
9,450
7,960
10
Anchor Development
9,950
7,960
11
Dulin & McClure
9,950
7,960
22
Duncan
9,000
7,960
42
Jardini
9,000
7,960
*172 Mortgage reported the sale of the entire Wildlife Estates tract to Evergreen as an installment sale on its 1970 income tax return. The payments reported received in the year of sale of $77,854.26, represented the total of the resale proceeds from the resale of the two lots referred to above, the $50,000 payment from Evergreen, and the cash collections received on the third party purchase money notes.
During 1970 Mortgage transferred on lot each to Allison and Krikac, respectively, of the 14 lots transferred to it by Acceptance. No entries were made on the books of Mortgage to record these transfers. Both Allison and Krikac reported the receipt of the lots as miscellaneous income on their respective 1970 tax returns and valued them at $100 for that purpose. With respect to the Goose Lake transaction respondent determined as follows: Income is adjusted in both 1969 and 1970 to reflect changes involving the joint venture into which you entered with McCoy Investment Company, resulting in an increase in income of $316,538.48 in 1969 *173 and a decrease in income of $6,691.00 in 1970 as shown below: Taxable year 1969: In the year 1969 you entered into a joint venture agreement with McCoy Investment Company Inc. Under this agreement, McCoy Investment Company Inc. would acquire property and subdivide it, while you would provide part of the financing, arrange for other outside financing and perform other services. In return for your activities under the joint venture agreement, you received title in December 1969 for 75 lots and 50 percent of the residual property of the subdivision concerned, known as Goose Lake Estates. It is held that you realized income in 1969 upon receipt of the 75 lots and residual property, includible in ordinary income as compensation for services. The amount of income to be included is measured by the fair market value of the property received. Inasmuch as you did not report any income in 1969 from the receipt of the lots and residual property, taxable income is increased by the full amount of the fair market value [as computed below less the capitalized costs of $10,000]. * * *
Upon receipt of the 75 lots from McCoy Investment Company, Inc., you transferred 14 lots to Lumbermans Mortgage *174 Company and 10 lots to Loomis Wine Cellars, both of which were wholly owned by you; these transfers were made at your cost of $100.00 per lot, rather than at fair market value. The transfer of the lots to your subsidiaries at your cost is considered not to be at arms length, and under the provisions of section 482 of the Internal Revenue Code of 1954 you are held to have realized income on such transfers to the extent of the excess of fair market value over cost.Since the 10 lots transferred to Loomis Wine Cellars and 12 of the 14 lots transferred to Lumbermans Mortgage Company were then in turn immediately resold by these subsidiaries to third parties, it is considered that the amount of income allocable to and reportable by you from these lots is measured by the net gain realized on the sales to the third parties. It is noted that the 10 lots transferred to Loomis Wine Cellars and subsequently sold to Mrs. Marie Seckel by that subsidiary had already been the subject of an agreement of sale between you and Mrs. Seckel on a date prior to that on which you received title to the entire 75 lots. Respondent also made the appropriate adjustments to reduce the short-term capital gain reported *175 by Acceptance on the sale of the Goose Lake lots to reflect his inclusion of the value of the lots as ordinary income in 1969. With respect to Acceptance's advertising expense deduction for 1970 respondent determined as follows: It is determined that the amount reported for advertising expense for the year 1970 includes the cost of gifts of wine to various business associates, and that the $25.00 limitation provided by section 274 of the Internal Revenue Code was not taken into consideration in arriving at the amount claimed. The portion of the advertising expense which exceeds the $25.00 limitation is disallowed, for an increase in taxable income of $1,203.94, as shown below: * * *. With respect to the franchise tax issue that affects Acceptance and Mortgage for 1960 and 1970 respondent determined that: Prior to the taxable year 1969, state franchise taxes were deducted in the taxable year to which they pertained. In 1969, a change was made for state franchise taxes and the deduction was accrued in the income year; in addition, the accrual for the deduction is based on when the income is earned regardless of when it is reportable as income for Federal income tax purposes. With *176 respect to the Wildlife Estates transaction respondent determined as follows: Capital gains reported for 1970 include a gain computed on the installment method arising from the resale of lots located near Alturas, California, to a Rolan Peterson, in accordance with a joint venture agreement dated January 5, 1970. In reporting the gain, you showed the down payment to consist of the resale proceeds of two lots which had been reconveyed to you as reimbursement for road construction costs, plus $50,000.00 payment received from the purchaser, plus cash collections received by you on third party promissory notes which the purchaser had received upon resale of lots and which the purchaser then gave to you as payment on his principal obligation of $380,000.00. It is held that the down payment reported is incorrect, inasmuch as it is determined that the agreement provides that the third-party notes--not the collections thereon--should be considered payment to you by the purchaser. When the value of the third-party notes is considered, the payments in the year of sale exceed 30 percent of the selling price, and the gain may not be reported on the installment method. * * * In addition, the *177 resale of the two lots received as reimbursement for the road improvements is held to represent a separate transaction; the commission expense applicable to the sale of these lots is considered herein as an expense of sale rather than an ordinary business deduction as reported by you. Respondent also made the appropriate adjustments to reduce the capital gain reported by Mortgage on the sale of the Goose Lake lots to reflect his inclusion of the value of the lots in Acceptance's income for 1969. With respect to the miscellaneous income reported by Allison and Krikac for 1970 respondent determined as follows: In the year 1970 you received a lot located in the Goose Lake Estates development from Lumbermans Mortgage Company, a wholly owned subsidiary of Lumbermans Acceptance Company, a corporation of which you are a stockholder and officer. You included $100.00 in miscellaneous income as the value of the lot. It is established that the fair market value of the lot is not less than $4,000.00, based upon the selling price for other lots to an unrelated party. The books of Lumbermans Mortgage Company do not contain entries covering the transfer of the lot to you or the reason for such *178 transfer. It is held that the amount includible in income by reason of receipt of the lot is the fair market value of $4,000.00, rather than the $100.00 reported by you, and taxable income is therefore increased by the additional value of $3,900.00.
OPINION This consolidated case presents for our determination several issues involving the business relationships and practices of Acceptance, Mortgage, Allison, and Krikac. The first issue concerns the nature of the business relationship between Acceptance and Investment with respect to their Goose Lake activities and the attendant tax consequences of Acceptance's receipt of property in December, 1969. Acceptance's position is that it entered into a joint venture with Investment to develop the property and that its receipt of the 75 lots represents a nontaxable distribution by a partnership to a partner. Respondent contends that the parties did not enter into a joint venture and that Acceptance's receipt of the 75 lots and the residual property represents ordinary income received for financial services rendered. We find the question a close one, but it is our responsibility to resolve the issue one way or the other. A joint venture *179 has been defined as a "special combination of two or more persons, where in some specific venture a profit is jointly sought without any actual partnership or corporate designation". Hyman Podell,55 T.C. 429, 431 (1970), 6 Mertens, Law of Federal Income Taxation, sec. 35.05. The term "joint venture" is included within the defintion of the term "partnership" as found in section 761(a) [5] with the former to be considered under the same concepts as the latter. Hyman Podell, supra at 431. The question of whether a joint venture has been created by the parties is essentially factual with special emphasis placed upon the intention of the parties. Commissioner v. Culbertson,337 U.S. 733 (1949); S & M Plumbing Co., 55 T.C. 702, 707 (1971). In sifting through the facts and circumstances of each case it is well established *180 that they are to be applied against a framework of four basix attributes that are indicative of a joint venture. These attributes include: a contract, express or implied, that a joint venture be formed; the contribution of money, property and/or services by the venturers; an agreement for joint proprietorship and control; and an agreement to share profits. S & M Plumbing Co., supra at 707. Acceptance has recognized these principles and has argued that their application in this case leads to the conclusion that a joint venture was formed. Acceptance points to the October, 1969 agreement executed by the parties and the testimony of Allison and McCoy in support of its position. However, our interpretation of the agreement and the other related events leads us to come down on the respondent's side of the arguments. In October, 1969 Acceptance and Investment entered into an agreement that established certain rights and obligations between them with respect to the Goose Lake property. Acceptance argues that this agreement represents the intentions of the parties in that it memorializes the various discussions held during which the project was discussed. The agreement, which is reproduced *181 in relevant part in the findings of fact, is entitled "Joint Venture Agreement" and does contain some indicia of a joint venture as that term is used in tax law. However, the form of the agreement is only one factor to be considered, S&M Plumbing Co.,supra at 707, and further we do not believe that it comports with the agreement's substance. In the opening part the project is described as being limited to the purchase and subdivision of the property. There is no indication that the parties contemplated the subsequent joint sale of the lots or agreed to a procedure of dividing the possible profits. From the description of their endeavor and despite a "Pro Forma Profit and Loss Statement" attached to the agreement, it does not appear that the parties jointly sought a profit or that there was any agreement to pursue a business venture and to divide the profits as such therefrom. We believe that an analysis of the remaining portions of the agreement supports this conclusion. In the next paragraph Acceptance was obligated to provide a $53,000 loan to Investment and to arrange for Investment the $80,000 secured loan from the Sierra National Bank. As noted previously, Acceptance was *182 licensed as a property loan broker to deal in commercial finance. It appears that Acceptance's obligations with respect to this project fit within its primary business activity. In a subsequent paragraph the agreement provides that the 75 lots were to be deeded to Acceptance "free and clear of any encumbrances * * *". There is no indication that Investment would have any control over the ultimate disposition of these lots or that Acceptance would have any control over the property retained by Investment. This conclusion is supported by the method, which will be discussed infra, by which Acceptance attempted to dispose of these lots. Further, in the same paragraph it provides that these lots were to be deeded to Acceptance "for and in consideration of the efforts, services and liabilities specifically assumed by [Acceptance] * * *". We find the specificity and certainty, as distinguished from a proportion of an unknown quantity, of the amount to be distributed significant. Between the parties Acceptance was entitled to the 75 lots in all events. Finally the agreement closed with the provision that it would terminate when the lots were distributed. The lack of a profit motive *183 we find fatal to Acceptance's position.S&M Plumbing Co.,supra at 707. The manner in which the agreement was implemented supports our conclusion. Acceptance fulfilled its obligations by providing and arranging for the financial requirements of the project. Pursuant to the agreements the loans were made directly to Investment. McCoy testified that his company, Investment, was directly liable for these loans. It is true that, when the venture terminated, Acceptance assumed and subsequently paid the outstanding indebtedness, but this fact indicates to us that Acceptance was merely financing Investment's project and was to receive part of the property for its trouble. Joe Balestrieri & Co. v. Commissioner,177 F. 2d 867 (9th Cir. 1949), affirming a Memorandum Opinion of this Court. Acceptance did in fact, pursuant to the agreement, receive the 75 lots in December, 1969. Even before they were actually received, Acceptance or its subsidiaries had negotiated with Pacific States, Seckel, and the Starretts for the disposition of all but three of these lots. Even though these sales agreements did not mature, due to the inability to resell the lots at a predetermined price, we believe *184 this clearly indicates that Acceptance had no intention of being in the real estate development business. Further, it appears these transactions were independently negotiated by Acceptance without any influence by Investment. Joe Balestrieri & Co. v. Commissioner,supra.Finally we do not agree that the president of McCoy testified that a joint venture had been formed. Acceptance has cited several cases in support of its position, but we find that they only emphasize the distinctions upon which we are relying. In Hyman Podell,55 T.C. 429 (1970), this Court found that a joint venture was created based upon an agreement to acquire, rehabilitate, and resell residential real estate. We have found the last element to be lacking in the case at bar. In Clarence A. Luckey,41 T.C. 1 (1963), affd. 334 F. 2d 719 (9th Cir. 1964), we found the existence of a joint venture where the invested capital was to be repaid from the first profits of the business. In the case at bar we have found that Investment was primarily liable for the outstanding debts which apparently were intended to be repaid from its own profits. We recognize that there are instances where Acceptance and Investment worked *185 together towards the development of the property.However, when compared to the other elements in this case, they seem relatively insignificant. We find that the second agreement, executed by the parties in February, 1970, provides some insight into the nature and extent of these joint activities. From our review, the agreement appears merely to be a recitation of the rights and obligations of the parties with respect to the events that had transpired. Finally we note that neither partnership books were kept nor tax returns filed to record and report these events, an omission which can be fairly described as an admission against interest. After a careful review of the evidence we hold that Acceptance and Investment did not enter into a joint venture to develop the Goose Lake property. We find that Acceptance received the 75 lots and its interest in the residual property on December 18, 1969 in return for financial services with respect to the property. Having made that determination we must now determine the fair market value of this property as of the above date so that Acceptance's income can be properly measured. Respondent originally determined the value of the 75 lots and *186 the residual property to be $291,597.48 and $34,941, respectively, arriving at a total value of $316,538.48 after deducting $10,000 for capitalized costs incurred by Acceptance. This figure was based primarily on the per lot value that Acceptance had negotiated in the sales agreements with Pacific States, Seckel, and the Starretts and the values at which portions of the residual property were subsequently sold. Respondent has now adjusted these figures to $141,300 ($1,884 per lot) and $38,000 for the lots and the residual property, respectively, based on a detailed appraisal made by Paul L. Benson (hereinafter Benson). This appraisal was made in June, 1975. Acceptance has introduced appraisals of the property prepared by Allison and Gerhardt G. Klatt (hereinafter Klatt). Both appraisals are based on the cost approach which values the property based on the expenses incurred to develop it and included the entire Goose Lake property less the expenses associated with the residual property.Using this method Allison and Klatt arrived at a value of $662 and $750 per lot, respectively. In their appraisals both Allison and Klatt indicate that the cost approach is an acceptable valuation *187 method in the absence of adequate comparable sales, offers, or listings. For support both men rely on guidelines that appear to be intended for an appraiser who is assessing the value of property for real estate tax purposes. Acceptance has failed to show the relationship between these guidelines and the traditional concepts involved in determining the fair market value of property for federal income tax purposes. Consequently we do not believe that we can give determinative weight to the appraisals entered in Acceptance's behalf. Benson's appraisal includes a general description of the property, a discussion of other real estate developments in the area, and a general discussion of the 75 lots in issue. He then assigned to each lot a basic fair market value and made adjustments for availability of roads, location, and terrain and arrived at gross potential sales value. This figure was then reduced by a profit percentage of 15 percent, selling expenses, and present worth factor to allow for a reasonable selling period to arrive at his fair market value for the 75 lots. We believe Benson's appraisal is more consonant with the principles involved in the determination of fair market *188 value of property. However, after reviewing the appraisal we believe it should be adjusted slightly. Benson made his appraisal in 1975 and he testified that he was not actually on the property until that time. He candidly admitted that he was not fully aware in 1975 of the condition of the property, especially the road development as of December, 1969. Benson in calculating the present worth factor determined that the lots could be sold in 6 months. Allison testified on this point and we find that, even if intensive sales methods were used, this time factor is unreasonably short. Increasing the time factor reduces the present worth factor which correspondingly reduces the present fair market value of the property. Benson also included in his considerations the fact that the public report had been issued on the property, although in fact it was not issued until February, 1970. Although the record does not indicate any serious reason why the public report would not be issued in due course, we believe that nevertheless an adjustment is appropriate. After a careful review of the evidence and considering the effect of the above adjustments to Benson's appraisal we believe the fair *189 market value of the 75 lots should be $105,000 or $1,400 per lot. Respondent originally determined that the value of Acceptance's interest in the residual property was $34,441, and now based upon Benson's appraisal contends that the value should be $38,000. Respondent bears the burden of proof to sustain the additional value now assigned to the residual property. Rule 142(a) Rules of Practice and Procedure of the United States Tax Court. Benson, in arriving at his figure, used the same procedures including references to comparable sales. In their appraisals Allison and Klatt assigned cost values to the various items of residual property and used them to reduce the total project cost to arrive at their per lot cost. Although as we have found, this method tends to understate the fair market value, the cost value assigned to the residual property by Allison and Klatt was $54,000 and $42,000, respectively, both of which are higher than Benson's figure.The latter's early 1970 for $6,750. Further Allison's and Klatt's early 1970 for $6,750. Further Allison's and Klatt's appraisals, which were primarily aimed at valuing the Goose Lake lots, contain little reference to the residual *190 property. We believe respondent has met his burden of proof with respect to the additional valuation and find that the value of the residual property should be $38,000. In 1970 Allison and Krikac each received one of the 75 lots deeded to Acceptance in December, 1969. The receipt of these lots was reported by them on their respective individual tax returns as miscellaneous income and valued at $100 each for that purpose. We have determined that the fair market value of these lots was as of December, 1969 $1,400 and we hold that this value should be used for this purpose also. We realize that additional improvements were being made to the property during this time (including the issuance of the public report) but the record is unclear as to their nature or value.Further, respondent in his argument with respect to this issue has referred us to his arguments with respect to the fair market value of the Goose Lake lots, and we believe that this is the most reasonable approach to take with this issue. Prior to 1969 both Acceptance and Mortgage only deducted their accrued state franchise taxes paid during a taxable year that related to the preceding taxable year. This procedure was *191 in accordance with respondent's position with respect to this matter as published in one of his revenue rulings. In 1969 both petitioners changed their procedures and deducted their accrual for state franchise taxes that related to the following taxable year. Neither petitioner sought respondent's approval to make this change. Both petitioners kept their books of account on the accrual basis of accounting. Respondent relies primarily on his position as established in his revenue ruling to support his determination. In addition respondent argues that this new method adopted by both petitioners represents a change of accounting method for which the petitioners first had to request the respondent's approval before it could be implemented. Section 446(e). Petitioners' reply to this latter argument is merely their bare assertion that section 446 does not cover the situation at hand. Section 446(e) provides: (e) Requirement Respecting Change of Accounting Method.--Except as otherwise expressly provided in this chapter, a taxpayer who changes the method of accounting on the basis of which he regularly computes his income in keeping his books shall, before computing his taxable income *192 under the new method, secure the consent of the Secretary or his delegate. In amplification of this provision the regulations provide in section 1.446-1(e)(2), Income Tax Regs.: (2)(i) Except as otherwise expressly provided in chapter 1 of the Code and the regulations thereunder, a taxpayer who changes the method of accounting employed in keeping his books shall, before computing his income upon such new method for purposes of taxation, secure the consent of the Commissioner. Consent must be secured whether or not such method is proper or is permitted under the Internal Revenue Code or the regulations thereunder. (ii)(a) A change in the method of accounting includes a change in the overall plan of accounting for gross income or deductions or a change in the treatment of any material item used in such overall plan. Although a method of accounting may exist under this definition without the necessity of a pattern of consistent treatment of an item, in most instances a method of accounting is not established for an item without such consistent treatment. A material item is any item which involves the proper time for the inclusion of the item in income or the taking of a deduction. *193 We believe that the new method used by the petitioners represents a change of accounting method within the meaning of the regulations. See also Bullard Company v. United States,364 F.2d 429 (Ct. Cl. 1966) and Hackensack Water Company v. United States,352 F. 2d 807 (Ct. Cl. 1965). Having made this determination we believe the clear language of section 446(e) prohibits petitioners' use of the new method until the appropriate consent is secured. Respondent's determination with respect to Acceptance and Mortgage for both 1969 and 1970 must be upheld. We are also disturbed by the wide disparity between the state franchise tax liability per the book accrual and the ultimate liability on the state tax return. We certainly are not objecting to petitioners' preparation of their respective returns in the most advantageous manner. However petitioners have argued that their accrual is proper since it is based on annual book income which is fixed by the year's end. It would seem then that any exemptions, deductions, or credits that would be applicable in preparing these state tax returns would equally be fixed and should be used in their calculation of their book liability which served *194 as the basis for their deduction on their tax returns. Included in Acceptance's deduction for advertising expenses on its 1970 tax return was the cost of wine delivered to various business associates including stock brokers, underwriters, and bankers. The wine was the product of Loomis, Acceptance's wholly-owned subsidiary. Respondent has determined that this expense is subject to the $25 limitation imposed by section 274(b)(1) and has accordingly disallowed a portion of the claimed deduction.The parties have stipulated that if the respondent's determination should be upheld, taxable income should be increased by $1,203.94. Acceptance has argued and has shown that it was contemplating a public offering of Loomis' stock.The evidence in the record indicates that several steps were taken in that direction. Acceptance argues that the wine was delivered to these people to identify Loomis' product and to enhance the prospects of the prospective stock offering. For support Acceptance has cited Lynch-Davidson Motors, Inc. v. Tomlinson,172 F. Supp. 101 (S.D. Fla. 1958), revd. on another issue 7 AFTR 2d 897, 61-1 USTC 9379 (5th Cir. 1961). We have no doubt that Acceptance's. motives in *195 delivering this wine were business related, but it has failed to consider the impact of section 274(b) which was enacted in 1962. This section provides: (b) Gifts. -- (1) Limitation. --No deduction shall be allowed under section 162 or section 212 for any expense for gifts made directly or indirectly to any individual to the extent that such expense, when added to prior expenses of the taxpayer for gifts made to such individual during the same taxable year, exceeds $25. For purposes of this section, the term "gift" means any item excludable from gross income of the recipient under section 102 which is not excludable from his gross income under any other provision of this chapter * * *. The purpose of this section is to disallow deductions that would have otherwise been allowable under section 162 if the additional restrictions imposed by this section are applicable. H. Rept. No. 1447, 87th Cong. 2d Sess. (1962), 1962-3 C.B. 423, 427 and 526, 529; S. Rept. No. 1881, 87th Cong. 2d Sess. (1962), 1962-3 C.B. 731, 739 and 873, 874. Despite Acceptance's business motives, we believe the statutory language is clear and the deduction must be limited. Acceptance has also argued that the *196 wine was to be distributed in a manner so that the $25 limitation would not be violated. Acceptance however has not introduced any evidence to support this claim. Section 1.274-3(d)(2), Income Tax Regs. Respondent's determination must be upheld. In January, 1970 Mortgage and Evergreen entered into an agreement with respect to the acquisition, development and a disposition of the Wildlife Estates. Pursuant to their agreement Mortgage took title to the property and received two lots, which were sold by Mortgage to a third party, as reimbursement for expenses incurred in fulfilling its obligations under the agreement. Mortgage then deeded the remaining property to Evergreen in return for a $380,000 note. Mortgage received a $50,000 payment from Evergreen in July, 1970 which was applied against the Evergreen note and also received, as Evergreen sold the individual lots, notes from the third party buyers of the lots. The face value of these notes was also applied against the Evergreen note.
Mortgage reported these transactions as an installment sale on its 1970 tax return. It included as payments received in the year of sale the amounts received from the third party sale of the two *197 lots, the $50,000 payment from Evergreen, and the cash collections on the third party notes generated by Evergreen's sale of the lots. Respondent determined that Mortgage could not use the installment sales method and concluded that Mortgage must recognize all of the gain realized in 1970. Further, the respondent determined that the third party sale of the two lots was a separate sale that should not be included in the transaction with Evergreen. Mortgage, in its petition, merely alleged that the increase to its taxable income with respect to this issue was in error. Mortgage has neither mentioned nor objected to respondent's severance of the third party sale of the two lots from the rest of the transaction in its petition, at trial, or in either of the briefs filed in its behalf. We hold that Mortgage has conceded this portion of respondent's determination. As noted previously respondent's determination was clearly premised on the proposition that Mortgage had sold the property to Evergreen and Mortgage's response, in its petition, did not raise any specific defense. Allison's testimony with respect to this issue was primarily directed at substantiating the applicability of *198 the installment sale provisions to this transaction. Mortgage, for the first time, in its opening brief has defended against this determination by arguing that no true sale occurred in 1970. We believe that this defense represents a new issue which has not been properly raised and for this reason decline to consider it. It is well settled that new issues may not be raised for the first time on brief. Eleanor C. Shomaker,38 T.C. 192 (1962); Estate of Akos Anthony Horvath,59 T.C. 551 (1973). Respondent in denying the use of the installment sale method to report this sale has included as payments received in the year of sale the $50,000 payment and the full face value of the third party notes produced from the sales of the lots by Evergreen. By so doing respondent argues that the payments exceed the 30 percent limitation imposed by section 453(b)(2)(A)(ii) making inapplicable section 453(b)(1). Mortgage contends however that the notes are in reality indebtedness of the purchaser and should be excluded when the determination with respect to the 30 percent limitation is made. [6] *199 We agree with respondent's position that these notes are third party notes and that they must be included as payments received in the year of sale. Carl F. Holmes,55 T.C. 53 (1970); 2 Mertens, Law of Federal Income Taxation, sec. 15.18, p. 57, 61. From the evidence in the record *200 with respect to this issue which was mostly stipulated we believe that Evergreen acquired the Wildlife Estates in return for its $380,000 note. Evergreen then sold the individual lots to third parties using their notes to satisfy its note. We however disagree with the amount respondent has included as being received in 1970 with respect to the receipt of these third party notes. Respondent has included them at their full face value. We believe it is well settled that when property is exchanged for notes the amount realized includes only the fair market value of the notes received in return for the property. Schlude v. Commissioner,372 U.S. 128, 136 n. 10 (1963); 2 Mertens, Law of Federal Income Taxation, sec. 11.07 p. 23. Further it appears that respondent's current position is inconsistent with that taken in the statutory deficiency notice where he explained with respect to this issue that "[when] the value of the third-party notes is considered * * *" the 30 percent limitation has been exceeded. These third party notes were generated by Evergreen's sale of the individual lots in Wildlife Estates. These notes were secured by deeds of trusts on the property sold, which was *201 already burdened by outstanding deeds of trusts, and represented approximately 90 percent, and in some sales 100 percent, of the purchase price. Both Allison and Klatt testified with respect to the fair market value of these notes and Klatt also reduced his conclusion to writing. Both men considered several factors in reaching their common conclusion that in total the fair market value of the third party notes was only 40 percent of their face value. Included in their consideration of these notes were such factors as the minimum amount of the down payment made, lack of a payment schedule, the lengthy term (14-1/2 years) of the note, the meager payment history, and the limited possibilities of public sale due to state regulatory restrictions. We find these factors to be supportive of Allison's and Klatt's conclusions. Respondent objects to the general nature of the conclusions and argues that an individual examination of the notes and their makers rather than one encompassing valuation should be made before any conclusions are drawn.Respondent's point is well taken but we believe that these notes bear enough common attributes to support Mortgage's position. In 1970 Mortgage received *202 $132,975 in third party notes that were applied against the outstanding balance of the Evergreen notes. The fair market value of these notes in 1970 was $53,190 (40 percent of $132,975). This amount coupled with the $50,000 payment received from Evergreen totals $103,190 which is less than 30 percent of the $380,000 selling price of the Wildlife Estates (30 percent of $380,000 equals $114,000). Consequently we believe Mortgage's installment sale treatment of this transaction was appropriate and should now be allowed to stand. [7] In the statutory notice sent to Acceptance, respondent's determination with respect to the Goose Lake transaction raised the possibility of reallocating income based upon the authority granted to him under section 482. Respondent was concerned *203 with the 14 and 10 lots that were transferred to Mortgage and Loomis, respectively, at Acceptance's then cost basis of $100 per lot and the subsequent purported resale of these lots by the subsidiaries at substantially higher prices to Seckel and the Starretts. Because it had determined that Acceptance's basis in these lots was much higher, respondent was concerned that a non-arm's length transfer between a parent and its subsidiaries had occurred. Before the respondent had made any determinations, Acceptance recorded the transfer of these lots at its then cost basis. Acceptance's basis in these lots is directly in issue in this case, and we have responded by largely adopting respondent's position that has the ultimate effect of increasing Acceptance's basis attributable to these lots. We are certain Acceptance will make the appropriate adjustments to implement our eventual decision and that such adjustments will obviate any reallocation of income under section 482. Respondent has recognized in his brief that if the basis in the lots is increased to equal their fair market value the allocation under section 482 would not result in additional gain to petitioner. We believe that *204 any further discussion of this matter at this time would not be beneficial. Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Lumbermans Acceptance Company, docket No. 3361-73; Lumbermans Mortgage Company, docket No. 3362-73, Stanley D. Krikac and Mary F. Krikac, docket No. 3386-73.↩
2. Due to losses incurred in earlier years Mortgage had inadequate surplus to pay the yearly dividends (payable each quarter) on the preferred stock during 1969 and 1970. As of December 31, 1968 only one quarterly dividend in the amount of $4,734.30 was in arrears. In December, 1969, dividends were declared for the last quarter of 1968 and the first three quarters of 1969 leaving one quarterly dividend of $4,707.90 in arrears. In December, 1970, dividends were declared for the last quarter of 1969 and all four quarters of 1970. These dividends were paid in January, 1971.
3. These figures include $2,373.53 and $1,445.79 for franchise tax penalties, respectively.↩
4. The full face value of the notes was used to cover expenses other than the cost of the land, thereby accounting for the differences between the two columns.↩
5. SEC. 761. TERMS DEFINED (a) Partnership. --For purposes of this subtitle, the term "partnership" includes a syndicate, group, pool, joint venture or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title [subtitle], a corporation or a trust or estate.↩
6. Sec. 453(b)(1) and (b)(2) in part provides as follows: (b) Sales of Realty and Casual Sales of Personalty. -- (1) General Rule. --Income from-- (A) a sale or other disposition of real property, or (B) a casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year) for a price exceeding $1,000. may (under regulations prescribed by the Secretary or his delegate) be returned on the basis and in the manner prescribed in subsection (a). (2) Limitation. --Paragraph (1) shall apply-- (A) In the case of a sale or other disposition during a taxable year beginning after December 31, 1953 (whether or not such taxable year ends after the date of enactment of this title), only if in the taxable year of the sale or other disposition-- (i) there are no payments, or (ii) the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 per cent of the selling price.↩
7. The $380,000 note given by Evergreen to Mortgage did not bear interest. Respondent has not attempted to impute an interest factor to this note thereby reducing the selling price and jeopardizing Mortgage's use of the installment sales method. Presumably this was done because the third party notes which were to replace the Evergreen note as Evergreen's sales program progressed did bear an appropriate rate of interest.↩