J. CLARK AKERS, III AND ELEANOR M. AKERS, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Akers v. Commissioner
Docket Nos. 6717-77, 6729-77, 6734-78, 6758-78, 6759-78, 5873-80, 5874-80, 5875-80, 5876-80.
United States Tax Court
T.C. Memo 1984-208; 1984 Tax Ct. Memo LEXIS 466; 47 T.C.M. (CCH) 1621; T.C.M. (RIA) 84208; April 24, 1984. *466 Held: 1. Fair market value of wastewater treatment plants was $75,000 when donated to Vanderbilt University; 2. Respondent did not abuse his discretion in requiring Asphalt Products Co., Inc. to change from the cash to the accrual method of accounting; 3. Medical insurance and reimbursement payments made by Asphalt Products Co., Inc. were made pursuant to a plan qualifying under sec. 105, I.R.C. 1954; 4. Payments made for the benefit of James C. Akers, Jr. and Estelle L. Akers are not constructive dividends to J. Clark Akers, III and William B. Akers; 5. Asphalt Products Co., Inc. may deduct such payments as ordinary and necessary business expenses under sec. 162, I.R.C. 1954; 6. James C. Akers, Jr. and Estelle L. Akers realized taxable income from the bargain rental and purchase of a residence from Asphalt Products Co., Inc.; 7. J. Clark Akers, III and William B. Akers did not receive constructive dividends from Asphalt Products Co., Inc.; and 8. For the taxable year 1974, Asphalt Products Co., Inc. is liable for the negligence addition determined under sec. 6653(a), I.R.C. 1954 attributable to its deduction of expenses incurred in transporting wastewater treatment plants. Mark H. *467 Westlake and Ervin M. Entrekin, for the petitioners. John L. Hopkins and Robert B. Nadler, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: In these consolidated cases, respondent determined deficiencies in petitioners' Federal income taxes and additions to tax as follows: Docket
Income Tax
Addition to Tax
Nos.
Petitioners
Year
Deficiency
[2] *468 Sec. 6653(a) 6717-77
J. Clark Akers, III
1967
$874.24
and Eleanor M. Akers
1968
3,453.27
1969
6,174.33
1970
5,597.34
6729-77
William B. Akers and
1967
772.53
Jo Ann Akers
1968
3,125.46
1969
5,632.80
1970
5,131.60
6734-78
J. Clark Akers, III
1974
15,704.93
and Eleanor M. Akers
1975
47,603.88
6758-78
Asphalt Products
1974
154,332.16
$7,716.61
Company, Inc.
1975
7,151.98
357.60
6759-78
William B. Akers
1974
14,927.70
and Jo Ann Akers
1975
53,713.62
5873-80
Asphalt Products
1976
17,031.14
Company, Inc.
5874-80
Estate of James C.
1976
12,929.62
Akers, Estelle L. Akers
Executrix and Estelle
L. Akers
5875-80
J. Clark Akers, III
1976
56,089.00
and Eleanor M. Akers
5876-80
William B. Akers
1976
56,186.00
and Jo Ann Akers
After concessions by petitioners and respondent, [3] *470 *471 the issues remaining for our decision are: (1) whether respondent correctly determined the fair market value of two wastewater treatment plants and related equipment donated to Vanderbilt University in 1975 by J. Clark Akers, III and William B. Akers; (2) whether Asphalt Products Company, Inc. properly reported income using the cash basis method, or whether it must use the accrual method of accounting; (3) whether medical insurance and reimbursement payments by Asphalt Products Company, Inc. to or for the benefit of James C. Akers, Jr., J. Clark Akers, III, and William B. Akers, were made pursuant to a plan qualitying under section 105; (4) whether the portion of these payments made for the benefit of James C. Akers, Jr. and Estelle L. Akers should be treated as constructive dividends to shareholders J. Clark Akers, III and William B. Akers; (5) whether Asphalt Products Company, Inc. may deduct such payments as ordinary and necessary business expenses under section 162; (6) whether James C. Akers, Jr. and Estelle L. Akers realized taxable income due to the below fair market rental or *469 bargain purchase of a residence from Asphalt Products Company Inc.; (7) whether J. Clark Akers, III and William B. Akers received constructive dividends from Asphalt Products Company, Inc. by virtue of such bargain rental and sale; and (8) whether Asphalt Products Company, Inc. is liable for section 6653(a) negligence additions for 1974 and 1975. FINDINGS OF FACT - GENERAL Some of the facts have been stipulated. The written and oral stipulations, together with the attached exhibits, are incorporated herein by this reference. Petitioners J. Clark Akers, III (hereinafter *472 sometimes referred to as Clark) and Eleanor M. Akers are husband and wife who, at the time of filing their petitions with this Court, were residents of Nashville, Tennessee. They filed joint Federal income tax returns for the calendar years 1967 through 1970 with the Southeast Service Center, Chamblee, Georgia, and for the calendar years 1974 through 1976 with the Memphis Service Center, Memphis, Tennessee. Petitioners William B. Akers (hereinafter sometimes referred to as William) and Jo Ann Akers are husband and wife who, at the time they filed their petitions with this Court, were residents of Nashville, Tennessee. They filed joint Federal income tax returns for the calendar years 1967 through 1970 and an amended return for 1970 with the Southeast Service Center, Chamblee, Georgia. They filed joint Federal income tax returns for the calendar years 1974 through 1976 and an amended return for 1976 with the Memphis Service Center, Memphis, Tennessee. Petitioner Asphalt Products Company, Inc. (hereinafter referred to as Asphalt Products) is a corporation with a principal place of business in Nashville, Tennessee at the time its petitions were filed. Its corporate Federal income *473 tax returns for the calendar years 1974 through 1976 and an amended return for 1976 were filed with the Memphis Service Center, Memphis, Tennessee. Estelle L. Akers (hereinafter referred to as Estelle) resided in Nashville, Tennessee at the time the petition was filed in docket No. 5874-80. For the calendar year 1976, Estelle L. Akers and the Estate of James C. Akers, Jr. filed a joint return and an amended return with the Memphis Service Center, Memphis, Tennessee. James C. Akers, Jr. (hereinafter referred to as James) died during 1976. Estelle died on January 3, 1982. Estelle and James were husband and wife, and are the parents of Clark and William. Eleanor M. Akers and Jo Ann Akers are parties to these proceedings solely by virtue of having signed joint Federal income tax returns with J. Clark Akers, III and William B. Akers.
For organizational purposes, we have found facts separately for some issues in these consolidated cases. However, as certain facts are relevant to more than one issue, they may be used as a basis for resolution of more than one issue. FINDINGS OF FACT-SPECIFIC I. Fair Market Value of Wastewater Treatment Plants
In the early 1970's, Environmental Quality *474 Engineering, Inc. (hereinafter referred to as EQE), a California corporation, built two portable wastewater treatment plants (plants). These plants were mounted on trailers. Some of the funds for the plants were borrowed from Pathfinder Resources, Inc. (Pathfinder), a subsidiary of Aladdin Industries of Nashville, Tennessee. [4] Between October 1972 and August 1973, EQE paid third parties approximately $165,000 for fabricating and furnishing the two plants, and for related materials. Of the $165,000, approximately $54,000 was for refurbishing the equipment in July and August of 1973. These amounts do not include the initial cost of the trailers themselves, or the engineering, design, and overhead costs of EQE. One of the wastewater treatment plants was designed specifically to demonstrate a process patented by the University of California under license to EQE. The other plant incorporates equipment which permits several chemical-physical wastewater treatment procedures to be performed independently. This capability allows the user to experiment with various forms of wastewater treatment at a particular *475 site in order to confirm such laboratory experiments as, for example, the type and size of permanent water treatment plant necessary to treat suitably the effluents at a particular site. When EQE failed financially, Pathfinder, as a secured creditor, offered the two plants for sale pursuant to sealed bids. Pathfinder reserved the right to accept or reject the bids received. In May 1974, bids were sought by a letter stating that Pathfinder was disposing of "an advanced waste treatment process and two fully-equipped pilot plant trailers," that "[i]n excess of $300,000 was spent to equip the trailers," and that the patent process rights were available either in conjunction with or separately from the trailers. Subsequently, another letter was sent stating that a large number of spare parts valued at approximately $10,000, including "several electric motors, electric pumps, switch boxes, valves, and assorted pipe fittings * * *," were to be included with the two plants. The bid-solicitation letter was sent to eighteen individuals at companies active in the pollution control business, many of them manufacturers of pollution control equipment. Only two bids were submitted to Pathfinder. *476 One bid in the amount of $15,010 was submitted by Richard Clark, the former president and owner of EQE, who had designed and supervised the building of the two plants. The other bid in the amount of $17,500 cash was submitted by William B. Akers and J. Clark Akers, III. The Akers' bid was accepted. On April 9, 1974, an inventory of the plants was performed in conjunction with the sale. In pertinent part, this inventory stated: The general overall condition of the equipment appeared to be in good condition. Since the equipment is stored out of doors, fairly near the bay, it is subject to a harsh environment and will need maintenance in the not to [sic] distant future if it is to retain its value. * * * Description of A.B.C. Equipment
The equipment * * * essentially consisted of two semi trailers (8' wide X 40' long with 8 tires - dual axle with dual wheels) on which were mounted a variety of tanks, pumps, etc., and various other paraphernalia located adjacent to the trailers on the grounds. The trailers and other equipment are stored outdoors (in Caral Co. parking lot). In general, the equipment appeared to be in good condition. There was no opportunity to turn on any of the *477 motors since the power lines were not connected. In addition to inventoried items, there were a large number of P.V.C. ball valves, fittings, and pipe (2" 0). Power cables are housed in conduits beneath the trailer bed (which is of checker plate construction). Power outlets are located at various locations on the trailer bed. All of the motor drives appeared to be 3 phase 230/460 volts type. Chemical and Biological Sedimentation tanks are equipped with constant speed collector mechanisms. Rubber squeegees move the sludge to the tank draw-off point where variable speed Moyno pumps move the sludge to the next treatment unit. The Recarbonation Device (burner) was partially disassembled and it was not possible to asscertain the method of its operation or the manufacturers [sic] name. it opparently runs on propane. William and Clark took title to the two plants and the spare parts upon payment of the purchase price, and received a bill of sale dated July 17, 1974. The two plants and related equipment were transported to Nashville, Tennessee and arrived there in late July or early August. The plants were inspected upon their arrival in Nashville by Professor Jack Roth of Vanderbilt *478 University. Professor Roth determined that the plants were not in operating condition. He worked out an agreement with the Metropolitan Government of Nashville and Davidson County (hereinafter Metro), to restore, refurbish, and modify the plants. Metro would then have the right to use the plants in order to verify certain design parameters of a major expansion of its own wastewater treatment facilities. During the fall of 1974 and winter of 1975, Metro had under study and design by its consultants, Consoer, Townsend & Associates, a major expansion of its Nashville wastewater treatment plant. During this period, Metro painted, repaired, and made the two pilot wastewater treatment plants operational for their use. The two plants were then used by Metro to study a proposed wastewater nitrification plan. [5] Vanderbilt University also conducted *479 experiments using one of the plants during 1975 and 1976. [6] These experiments were conducted as a part of an Environmental Protection Agency (EPA)-funded biological treatment study. This study attempted to develop a monitor [7] that would predict the behavior of "upsets" to waste treatment plants. The plant and related equipment were necessary to test the monitor on a "reasonable scale" apparatus. William and Clark conveyed title to the plants to Vanderbilt University on December 31, 1975. The Document accompanying the transfer was entitled "Bill of Sale," and provided that William and Clark conveyed to Vanderbilt University their "right, title and interest" in the two plants "[f]or the purpose of making a charitable contribution to Vanderbilt University School of Engineering and with the understanding *480 that [the plants were] needed to further enable the School of Engineering to carry out its educational purpose * * *." At approximately the date of the transfer, two appraisals were requested and obtained by Vanderbilt University. The first, from Jerry Shell of Environmental Engineers, provided a cost estimate of the two plants based on Shell's judgment of the condition of the plants and their replacement cost. The appraisal was based on his observation of the plants on October 16, 1975. The plants were found to be in good operating condition. A detailed cost breakdown of the value of the separate parts of the plant totaled $105,635. To this amount, $79,226, or 75 percent of the total cost of the separate plant parts was added for the cost of "engineering, erection and contingencies." The appraisal indicated that the percentage was based on the high degree of complexity of the equipment and its controls. Thus, the estimated value of the two plants totaled $184,861. The second appraisal, dated December 29, 1975, was from William F. Brandes of Smith, Seckman, Reid, Inc., Consulting Engineers. This appraisal estimated the value of the plants and the related spare parts using two *481 different methods. After considering both methods, Brandes determined that the plants had a fair market value of $210,000. The first method used the following approach. The actual fabrication and erection costs of the two plants were estimated. To this figure, 100 percent was added for concept, design, and engineering. Accordingly to Brandes, this percentage was used because the plants were "unique items, highly original and employing advanced technology. * * * A great deal of professional time and experimentation was necessarily involved in devising these plants." To these direct and indirect costs, Brandes added the value of the spare parts estimated at between $4 and $6 per pound. Thus the total estimated value was: Trailer #1
$38,290
Trailer #2
43,965
Development and Engineering
82,255
Parts and Accessories
46,000
Total
$210,510
The second method of estimating value was based on a projected reasonable rental fee, including repair and maintenance. This method determined that a reasonable rental fee for the two plants was $15,000 per month. Repair, refitting, and maintenance was assumed to cost 25 percent of rental. Additionally, a 50 percent "utilization factor" and a nine percent *482 interest rate were added over a life of 48 months. Under this method, the present worth of the equipment was calculated to be approximately $225,000. In December 1980, at the request of petitioners, an appraisal of the plants was made by Dr. John H. Koon, Director of Waste Management for Associated Water and Air Resources Engineers, Inc. In his appraisal report of May 1, 1981, Koon broke down his estimate of value as follows: Present Cost
April 1974 Cost
Item
Trailer 1
Trailer 2
Trailer 1
Trailer 2
Tanks
$ 20,765
$ 20,700
$10,380
$10,350
Equipment
12,390
18,180
6,030
9,600
Installation and
18,580
27,270
9,050
11,000
Assembly
Piping
10,230
9,100
7,000
7,000
Wiring and Electrical
12,300
13,700
6,830
7,600
Control
Grating, Ladder and
3,000
1,500
1,500
750
Platform, structural
Engineering, Planning
22,720
22,720
12,600
12,600
Construction Supervision
8 X 40 ft Trailer
15,000
15,000
9,000
9,000
$114,985
$128,170
$62,390
$67,900
Total Cost
$243,155
$130,290
(Excluding two boxes of
spare parts and equipment)
Two boxes of instruments, spare motors, pumps, pipe hoses, pipe fittings, wiring, laboratory equipment and wet weather gear were not evailable for inspection by Dr. Koon. Respondent had Stephen A. Wilgus, engineer, appraise the plants and *483 estimate their worth in 1975. In carrying out his appraisal, Wilgus made an on-site inspection of the two plants on January 4, 1982. He also interviewed several persons: three from Metro; two from Vanderbilt; a sales representative of Envirex, a firm that manufactures, sells, and leases pilot plants; and one from Consoer, Townsend & Associates. After considering the cost, market, and income approaches to valuation, Wilgus concluded that the fair market value of the two plants on December 31, 1975 was $20,500. This conclusion was based on the assumptions that the plant title was marketable and free of liens, that his sources of data were reliable, and on the incorrect assumption that all repairs made by Metro were made after December 31, 1975. II. Method of Accounting used by Asphalt Products
Asphalt Products (petitioner) is a producer of emulsified asphalt. [8] *484 Emulsified asphalt, a product used in paving roads, is manufactured from pure asphalt using a chemical treatment and physical process. Emulsified asphalt is preferable to pure asphalt in road paving because it can be spread at much lower temperatures, resulting in energy savings in preparation and application. Originally, Asphalt Products bid on road paving jobs and when a bid was successful, it prepared the emulsion and subcontracted the paving job to the Globe Company, Inc. (Globe), a road contracting company incorporated in 1959. All stock of Globe was owned by the Globe Company Partnership (Globe Partnership), which after 1965, was owned by William and Clark. In 1971, Globe sold its principal operating assets and its name was changed to Akers, Inc. The Globe Partnership, however, was not dissolved. Subsequently in 1973, Akers, Inc. transferred its assets to Asphalt Products. After this time, Asphalt Products was in the contracting business. Very little road contracting work is done by Asphalt Products in the colder months of December, January, and February. Asphalt Products generally closed its operations completely in mid-December, and all employees took vacations from mid-December until early January. Emulsified asphalt solidifies when not kept warm and is ruined when it freezes. Consequently, Asphalt Products did not keep any finished *485 product in its tanks during the two-week shutdown period. The company sold its finished product prior to the plant shutdown, leaving no yearent inventory of finished product. Furthermore, Asphalt Products generally did not have a significant stockpile of raw materials in mid-December, because sales of its products slowed during wintertime, increasing again around the beginning of March. This general inventory-clearing procedure changed in 1973 due to the Arab embargo on oil sales to the United States. Asphalt emulsion raw materials are derived from oil refining-process residue. The oil-refining company suppliers of Asphalt Products indicated that it had to purchase its quota by a certain date to assure the availability of raw product in a subsequent year. Asphalt Products was, therefore, obliged to maintain some inventories of raw material at year-end. Several Tennessee counties, customers of Asphalt Products, were also affected by the embargo. Previously, the price of the asphalt emulsion rose only from 11 cents per gallon in 1951 to 14 cents in 1973. In 1974, the price rose to 28 cents and by 1982, the price was 75 cents per gallon. As the price rose, gasoline consumption *486 declined. Because the counties received a portion of their funding for road work from a two-cent per gallon gasoline tax, they had difficulty meeting payments owed on work for which they had contracted in previous years. Thus, Asphalt Products' accounts receivables increased. Asphalt Products always reported its Federal income tax liability on the cash basis method of accounting. Its books are maintained on a cash receipts and disbursements basis. With regard to the asphalt portion of the business, work papers are prepared in the form of balance sheets and list accrual accounts for the company. These workpaper balance sheets were instituted so that the company management could keep track of cash flow during their busy months. Figures available in the books, records, and workpapers of Asphalt Products showed the following accrual account balances for January 1, 1974 through December 31, 1976: 1-1-74
12-31-74
12-31-75
12-31-76
Inventory
$16,453.76
$25,812.83
$36,374.86
$1,583.00
Accounts Receivable
71,482.09
264,269.42
256,078.17
237,991.75
Accounts Receivable-
822.50
425.81
523.30
697.78
Inspection
Accounts Payable-
27,892.83
9,567.36
63,227.53
82,626.55
Trade
Accounts Payable-
435.31
270.02
297.25
136.96
Royalties
Accounts Payable-
372.68
156.34
220.52
1,451.84
Sales Taxes
*487 The difference between taxable income shown on returns filed by Asphalt Products for the years at issue, and taxable income as calculated by respondent under the accrual method, taking into account appropriate adjustments is compared in the following chart: 1974
1975
1976
Taxable income
$117,803.55
$37,963.51 $38,780.20 on return
Taxable income on
439,497.44
59,383.32 80,339.13 statutory notice
Adjustment to taxable
280,514.34
(51,283.31)
(73,173.85)
income based on change
of accounting method
Taxable income
375,879.18
35,727.87 10,704.74 taking into account
10-year spread forward
In 1974, Asphalt Products received about $120,000 as its portion of a judgment from a lawsuit concerning the collection of a contract amount dating back to 1967. Taxes were paid when the judgment was received, according to the cash method practice. III. Benefits to Officers and Employees of Asphalt Products
James was born in 1891. He graduated from Vanderbilt University School of Engineering in 1912. He worked for a short time as an independent engineer and then served in the United States Army Corps of Engineers during World War I. In 1925, he became the first Director and Engineer of the Davidson (Tennessee) County *488 Highway Department and served in that capacity until his retirement in 1955. During his time with the Davidson County Highway Department, James was instrumental in designing legislation for Tennessee that gave part of the state gas tax revenue to counties for highway departments. Originally all Tennessee counties paved with hot asphalt. Pure asphalt was transported to Davidson County in railroad cars. The asphalt then was heated in the railroad cars for up to two days before it could be transferred to an applicator machine. The applicator machine also had to have a heat source sufficient to maintain the high temperatures required for spraying. At a temperature of approximately 300 degrees Fahrenheit (about 149 degrees Celsius), the asphalt became liquid and would be sprayed on the roadbed. In the mid-1920's, early in James' career with the Davidson County Highway Department, James met John Kelly (Kelly), who owned an emulsified asphalt plant in Terre Haute, Indiana. When James learned that the use of emulsified rather than pure asphalt would produce savings in energy, money, and labor, he entered into an agreement with Kelly to have a plant placed in Davidson County. Thus, *489 Davidson County began using emulsified asphalt in the late 1920's, although most rural, mid-Tennessee counties continued to use pure asphalt through the 1940's. In the late 1940's, Kelly set up a private emulsified asphalt company, the predecessor of Asphalt Products, in order to sell emulsified asphalt throughout mid-Tennessee. Kelly hired William Akers (William) to help with the company. At that time, William was with the United States Corps of Engineers, had served in the Navy in World War II, and received his graduate engineering degree from the Massachusetts Institute of Technology. In the early 1950's, Kelly gave William an option to purchase a half interest in Asphalt Products, but continued to operate the company himself. Clark graduated from Vanderbilt University in 1949 and worked first for a general contracting company, and then a paving contracting company. In 1953, he went to work for Asphalt Products. By 1955, Asphalt Products had two Tennessee branches, one in Nashville and one in Knoxville. In 1955, Kelly asked James to work for Asphalt Products as a salesperson. He was to try to persuade county road superintendents throughout Tennessee to switch to emulsified *490 asphalt. At that time, James was particularly qualified for the job, in that he belonged to the "County Road Superintendents and County Road Engineers Association," a group of all Tennessee county road superintendents (the members of which he had come to know quite well), and because of his longstanding experience in emulsified asphalt. Consequently, James started work as a salesman for Asphalt Products. After he started this job, he was elected Secretary of the Tennessee County Highway Association. In 1962, another salesman, G. Webb Cowan (Cowan), was hired by Asphalt Products. Cowan then called on company customers until 1967, when he became seriously ill. After Cowan died, Asphalt Products hired James Love, who died unexpectedly in 1974. Kelly formed Globe, Inc. in 1959 to provide paving services for Asphalt Products. In 1965, the shareholders divided the two braches of Asphalt Products. The physical assets and trade name were distributed to William and Clark, who eventually incorporated the assets under the name Asphalt Products. Since that time, all stock of Asphalt Products has been owned by the Globe Partnership. William and Clark each own a 50 percent interest in the *491 Globe Partnership. [9]
A. Medical Benefits
On March 10, 1959, Globe adopted a plan entitled "Accident and Health Plan for Officers." The plan provided for the reimbursement or direct payment of medical expenses as defined in section 213, for officers, their spouses, and dependents. In addition, the plan included a "wage continuation plan" whereby an officer was entitled to at least a minimum wage of $100 per week while absent from work on account of sickness or personal injury. On December 31, 1972, Asphalt Products adopted a plan entitled "Uniform Accident and Health Plan for Employees, Medical Expense Reimbursement and Disability Benefits Plan." This plan provided, in pertinent part: ITEM I Purpose of the Plan
ASPHALT PRODUCTS COMPANY, INC. voluntarily establishes this plan in order to increase the social insurance protection available to its employees by providing them with medical expense reimbursement and benefits to replace wages lost by reason of absence from work because of occupational and non-occupational personal injuries and sickness. It is agreed and understood that all qualified employees except officer employees *492 shall be entitled to no benefits until action of the Board of Directors establishing a benefit limit on a noncumulative basis for all qualified employees except officers; and officer employees shall be subject to no limitation in benefits until and unless the Board of Directors acts to adopt a limitation on the annual benefits payable pursuant to this plan. It is further agreed and understood that the corporation may in the discretion of its officers take out medical and/or hospitalization insurance in which event the premiums paid by the corporation shall be treated as payments under this section of the plan and shall be payable in addition to the limits hereinabove established, if any. * * * ITEM III Benefits
1. Reimbursement of Medical Expenses.
If any * * * officer * * * presents a bill to said corporation for the payment of any "medical expense" as that term is defined in Section 213 of the Internal Revenue Code of 1954 and the regulations and case law thereunder and said medical expense was incurred for the medical care of the particular employee, his or her spouse, or his or her dependents, as defined in Section 152 of the Internal Revenue Code of 1954, and such "medical *493 expense" was incurred by said employee, his or her spouse, or his or her dependents at a time when said employee was employed by this corporation in a capacity so as to qualify said employee for benefits under this Plan, such "medical expense" shall be paid either directly by this corporation, or if for any reason the employee, his or her spouse, or his or her dependents, have previously paid such "medical expense" and can offer proof of such payment, this corporation shall reimburse to the employee an amount equal to the amount so paid in lieu of direct payment of said "medical expense." * * * It is agreed and understood that all qualified employees except officer employees shall be limited to $     in benefits, such limitation is to be non-cumulative; and officer employees shall be limited to $     in benefits for any one calendar year, such limitation to be non-cumulative. It is further agreed and understood that the corporation may in the discretion of its officers take out medical and/or hospitalization insurance in which event the premiums paid by the corporation shall be treated as payments under this Section of the Plan. 2. Wage Continuation.
(a) An employee who is absent *494 from work because of personal injury or sickness shall be paid by the Company on a weekly basis, a benefit for each day of such absence for which benefits are payable under this Item and Item IV hereof which is equal to his compensation divided by the number of days in his normal workweek. * * * ITEM IX Rights
The Company may in its sole and absolute discretion determine additional medical benefits on an employee by employee basis. * * * ITEM X Reimbursement to Employer
The Company may in its sole and absolute discretion demand reimbursement for all items paid to the employee under this Plan which were disallowed as an exclusion from income on his individual federal income tax return and disallowed as a deductible business expense by the Company on its federal income tax return. If the preceding sentence applies, then it is to be conclusively presumed that the employee is not qualified under this Plan and that the payment made to him is made as a loan to said employee and that said employee must repay the money to the corporation within thirty (30) days from the date that the said determination is made together with interest from date that the employee receives the payment at the *495 rate of four percent (4%) per annum or such increase in interest as may be designated by the Commissioner of Internal Revenue Service is in regard to installment sales contracts which interest is presently stated to be four percent (4%) per annum. * * * Asphalt Products held a group medical policy for all its full-time employees with the Life and Casualty Insurance Company of Tennessee. The issue date on the policy was November 1, 1973. [10] The policy provided employees with accidental death, dismemberment and loss of sight benefits, and provided employees and their dependents with major medical expense benefits. Asphalt Products' salesman, Cowan, became unable to work in July 1967, due to serious illness. The company paid a total of $5,950 in sick pay until Cowan's death in March 1968. Asphalt Products also paid medical expenses totaling approximately $10,000 in Cowan's behalf. Life and Casualty Insurance Company of Tennessee reimbursed Asphalt Products for $2,771.92 of this amount. Cowan was never an officer, director, or shareholder of Asphalt Products. Fred Elkins was *496 a truck driver for Asphalt Products.He became disabled and received $8,000 in sick pay from May 1, 1978 through April 15, 1979. Rudy Shelton and Clarence Holton also were truck drivers for Asphalt Products. Between July 1967 and April 1968, Asphalt Products paid medical expenses in the amounts of $403.60 for Rudy Shelton and $500 for Clarence Holton. Within this time period, Asphalt Products paid $193.19 in medical expenses for Phyllis Burns, a company secretary. Rudy Shelton, Clarence Holton, and Phyllis Burns were not officers, directors, or shareholders of Asphalt Products at any time. Between January 1965 and April 1979, Asphalt Products paid $178,002.38 for medical insurance, sick pay, and in direct payment of employee medical expenses. Of this amount, $49,097.24 ($4,500 sick pay; $44,597.24, medical benefits) was spent to benefit employees who were shareholders and officers; $26,759.89 ($13,950, sick pay; $12,809.89, medical benefits) was spent for employees who neither shareholders nor officers; and $102,145.25 was spent for group medical insurance premiums. The only officers of Asphalt Products from 1972 to 1976 were William, Clark, and James. For the taxable year *497 1976, respondent held William and Clark taxable on alleged constructive dividends by virtue of medical expense payments made by Asphalt Products to James or Estelle. B. Residence
In May 1959, soon after Globe was formed, Globe purchased a residence at 248 Harding Place, Nashville, Tennessee (hereinafter sometimes referred to as the Harding Place residence). On or about the same day, an option agreement was given by Globe to James and Estelle. The agreement was signed by Clark as president of Globe and provided: OPTION
FOR AND IN CONSIDERATION of the Agreement by J. CLARK AKERS, JR. and wife ESTELLE L. AKERS to permit THE GLOBE COMPANY, INC. to acquire certain property fronting 120 feet on the northeasterly side of Harding Place from L. W. Cherry and wife Evelyn M. Cherry and other good and valuable considerations, the receipt of all of which is hereby acknowledged as having been paid by J. Clark Akers, Jr. and wife Estelle L. Akers. The Globe Company, Inc., acting by and through its duly authorized president agrees to the following: 1. J. Clark Akers, Jr. [James] and wife Estelle L. Akers may take possession and occupy said property described in Exhibit "A" attached hereto and *498 pay therefor the cash sum of One Hundred Dollars ($100.00) per month together with all routine maintenance. 2. So long as said property is occupied by the said J. Clark Akers, Jr. and wife Estelle L. Akers, they or the survivor of them shall have the right and option to acquire said property for the cash purchase price of Twenty-One Thousand Five Hundred Dollars ($21,500.00) plus One Thousand Dollars ($1,000.00). 3. If the Optionee elects to exercise the option to purchase the property, the closing shall take place during the month of December in the year in which notice of exercise is given by the Optionee to the Optionor. The Optionee shall be credited with an amount equal to one-half (1/2) of the rental payments previously made and the balance shall be payable in cash.Ownership in the property was retained by Globe and its successor corporations, Akers, Inc. and Asphalt Products. On December 31, 1976, Estelle purchased the property from Asphalt Products for $22,500. Near the time of purchase, an independent appraiser found the fair market value of the property was $43,000. During his employment with Asphalt Products Company, Inc. from 1965 to 1976, James was paid the following *499 cash compensation: Year
Amount
1965
$5,900
1966
7,500
1967
11,400
1968
10,400
1969
8,400
1970
14,400
1971
9,600
1972
9,600
1973
9,600
1974
11,520
1975
10,800
1976
* 10,800
Respondent held William and Clark taxable on amounts relating to the alleged bargain lease and bargain sale of the Harding Place residence and property between Asphalt Products and James and Estelle. With respect to the residence, respondent also charged the full amount as income to James and Estelle, although in all cases agrees that no more than 100 percent of any of these items may be allocated among the individual petitioners. OPINION I. Issue 1-Fair Market Value of Wastewater Treatment Plants
When a taxpayer makes a contribution to a properly qualified charitable organization of property other than money, he is allowed a deduction in the amount of the fair market value of the property at the time of the contribution, reduced as provided in section 170(e)(1). Section 1.170A-1(c)(1), Income Tax Regs. The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and *500 both having a reasonable knowledge of relevant facts. Section 1.170A-1(c)(2), Income Tax Regs.
Our task here is to determine the fair market value of the two wastewater treatment plants as of December 31, 1975, the time they were contributed by William and Clark to Vanderbilt University. Respondent claims the equipment was worth $17,500 when donated to Vanderbilt, the same amount that William and Clark bid and paid to purchase the plants in 1974. As reinforcement for his position, respondent contends that his valuation is within the bounds marked at one end by the only other bid at the time the plants were purchased, in the amount of $15,000, and at the other end by the determination of his expert, Stephen Al. Wilgus (Wilgus) that the plants were worth $20,500 in December 1975. Petitioners William and Clark, on the other hand, claim that the fair market value of the plants when donated was $201,000. Petitioners derived this value from a rough averaging of the values obtained by their experts. Petitioners also contend that respondent's reliance on bid price and on Wilgus' appraisal is erroneous. We find the fair market value of petitioners' donation at the time of contribution *501 to Vanderiblt was $75,000. Respondent contends that the price bid for the plants is a good indicator of their value. Respondent maintains that although the original sale was well-advertised in the industry, only one bid was received besides that of the petitioners. Respondent argues that this supports a finding that no resale market exists and that no objective proof is available to show that the plants were worth more. We do not consider the winning bid price to be the best indicator of the value of the plants in this case. We furthermore doubt that even this price could constitute the "objective" proof which respondent seeks. Although we recognize that the market for the plants would of necessity be limited, it is not so limited as to necessitate restricting evidence of the value of the plants to the 1974 bid price. Petitioners, moreover, convincingly have shown that notice of the sale did not go out to those who would be most interested. Indeed, none of the parties notified of the sale was interested enough to bid on the plants. Petitioners' expert, Dr. Koon, testified at trial that the list of potential buyers to whom notices of the sale were sent principally consisted of *502 equipment manufacturers, leaving out more likely potential buyers such as environmental engineering consulting firms and research institutions. Equipment manufacturers usually design and manufacture their own plants to their own specifications and normally would not be interested in acquiring used plants from competing companies. Additionally, the marked difference between the cost of building and equipping the plants and the bid price indicates that bid price may not be the best means of valuation in the present case. [11] Respondent also contends that the bid price should be used as the fair market value because petitioners bought the plants without expectation of reselling them. Respondent maintains that William and Clark did not know anything about the equipment, were not in the resale business, did not investigate a potential *503 resale market, and did not inspect the equipment prior to purchasing it. Respondent argues that the evidence shows that William and Clark intended at all times to donate the plants to Vanderbilt and, therefore, that petitioners are only entitled to a deduction in the amount paid for the plants. The facts contained in the record do not warrant our finding that petitioners acted as an agent for Vanderbilt in the purchase of the plants, nor do they warrant a conclusion that petitioners were compelled to donate the plants to Vanderbilt. The documents of title indicate that the plants were owned by the petitioners at all times before the donation. The fact that Metro and Vanderbilt may have used or examined the equipment would not have prevented William and Clark from prohibiting further use of the equipment, or from otherwise exerting their dominion and control over the plants. Moreover, the repairs to the plants undertaken by Metro prior to the donation can be construed as an indirect fee for Metro's use of the plants for its own studies. Respondent's expert, Wilgus, determined that the value of the two plants on the date of transfer was $20,500. The calculations of value were based *504 primarily on an income approach using rental rates and amount of use estimates to adjust the expected gross revenue projections. There are various weaknesses in this method of valuation. Wilgus did not take into account in his calculations the expenditures made by Metro before the date of the gift that restored the plants to full function and use. Furthermore, as petitioner correctly argues, the income and market approaches to an estimate of fair market value are not entirely reliable in a case such as this where there is a limited market for equipment. Wilgus acknowledged at trial that he had little information on which to base an income or market approach. In fact, Wilgus testified that, to his knowledge, there was no one who rented this type of equipment for profit in the marketplace. Wilgus also testified at trial that he had not included various spare parts in his valuation estimates. Wilgus' appraisal of value was made in 1982, several years after the gift, and therefore, is based in part on his extrapolations from interviews with various parties involved rather than on direct examination of the equipment. Finally, Wilgus ignored the unique value of these plants as a research *505 tool. This is surprising in view of the fact that the plants were originally constructed as research aids, and not as traditionally "fixed" wastewater treatment plants. Petitioners' experts had considerable experience in the wastewater treatment field. All their calculations of fair market value used the cost approach to valuation, although Brandes used a projected rental value approach as well as a cost approach. Despite the recognized expertise of petitioners' evaluatiors, we are not disposed to accept their various calculations without certain modifications. Expert testimony is not required to be accepted as gospel, and we may evaluate their testimony in light of the entire record. See Dayton Power & Light Co. v. Public Utilities Commission,292 U.S. 290, 298-300 (1934); Cupler v. Commissioner,64 T.C. 946, 956 (1975); Keystone Wood Products Co. v. Commissioner,19 B.T.A. 1116, 1121 (1930), affd. 66 F.2d 258 (2d Cir. 1933). The appraisals by Terry Shell and William F. Brandes were made near the time of the donation and show that the plants were in operating condition in 1975. The cost approach used, however, does not account for depreciation or wear and tear. Both the nature *506 of the work required of the plants and the storage conditions dictate some adjustment for these factors. At issue in the present case is a determination of the fair market value of the plants at the time of the gift, and not the potential reproduction cost. The same failure to adjust for current equipment condition is also demonstrated in the estimate of value made by Dr. John H. Koon. Respondent questions the adjustments for inflation rate in the Koon estimate. We do not think that this adjustment as used by Dr. Koon, significantly affected the projected estimate of 1974 worth. Offsetting any error in that regard is the fact that Koon's estimate did not take into direct account the related spare parts and equipment donated with the machines. Finally, we note that in addition to their general educational value, the plants were of value to Vanderbilt in obtaining a grant from the Environmental Protection Agency. Dr. John Roth, a professor of chemical and environmental engineering at Vanderbilt University testified he did not believe Vanderibilt would have received the grant without the plants or equivalent equipment. Testimony given by Dr. Koon also supports our conclusion that *507 the equipment was of particular value. Dr. Koon testified that Vanderbilt was one of the top schools in the industrial wastewater treatment field at the time of the donation. As the plants were primarily suited for use as research tools, they were valuable additions to the Vanderbilt University environmental engineering department. The use to which donated property will be put is an element in determining value. Cupler v. Commissioner,64 T.C. at 955; see Guggenheim v. Rasquin,312 U.S. 254, 257 (1941). After considering all the facts presented in the record in this case, we conclude that the fair market value of the plants at the time they were donated to Vanderbilt University was $85,000. Accordingly, we hold that the total amount of charitable contribution is $75,000. [12]
II. Issue 2-Correct Method of Accounting
Section 446(a) provides that taxable income shall be computed under the method of accounting on the *508 basis of which the taxpayer regularly computes his income in keeping his books. Permissible methods for computing taxable income include the cash receipts and disbursements and the accrual methods.Section 446(c). An exception, however, is provided under section 446(b) whereby, when the method used by a taxpayer does not clearly reflect income, the computation of taxable income shall be made under such method as in the opinion of the respondent does clearly reflect income. See section 1.446-1(b)(1), Income Tax Regs. Respondent had broad discretion in determining whether a taxpayer's method clearly reflects income. Thor Power Tool Co. v. Commissioner,439 U.S. 522, 532 (1979); United States v. Catto,384 U.S. 102 (1966); Commissioner v. Hansen,360 U.S. 446, 467 (1959).Moreover, the taxpayer has a heavy burden in overcoming respondent's determination. Thor Power Tool Co. V. Commissioner,supra;Lucas v. Structural Steel Co.,281 U.S. 264, 271 (1930); Brooks-Massey Dodge, Inc. v. Commissioner,60 T.C. 884, 889 (1973). The standard used is that respondent's determination must not be interfered with unless clearly unlawful or plainly arbitrary. Thor Power Tool Co. v. Commissioner,439 U.S. at 532-533. *509 Inventory must be accounted for in a taxpayer's method of accounting. Section 1.446-1(a)(4)(i), Income Tax Regs. provides: (i) In all cases in which the production, purchase, or sale of merchandise of any king is an income-producing factor, merchandise on hand (including finished goods, work in provess, raw materials, and supplies) at the beginning and end of the year shall be taken into account in computing the taxable income of the year. * * * Additionally, with respect to the provision in section 446(c) allowing the use of either cash or accrual method, a special rule is included in the regulations whereby, when it is necessary to use an inventory, the accrual method of accounting must be used with regard to purchases and sales, unless otherwise authorized under section 1.446-1(c)(2)(ii), Income Tax Regs.Section 1.446-1(c)(2)(i), Income Tax Regs., provides: In any case in which it is necessary to use an inventory the accrual method of accounting must be used with regard to purchases and sales unless otherwise authorized under subdivision (ii) of this subparagraph. [Emphasis supplied.] Section 1.446-1(c)(2)(ii), Income Tax Regs., provides in part: [T]he Commissioner may authorize *510 a taxpayer to continue the use of a method of accounting consistently used by the taxpayer, even though not specifically authorized by the regulations in this part, if, in the opinion of the Commissioner, income is clearly reflected by the use of such method. * * * [Emphasis supplied.] Petitioner has accounted for its inventory within its method of accounting, the cash method, and contends that the cash basis method of accounting did clearly reflect its income during the years at issue. In maintaining this position, petitioner relies on the standard set forth in Osterloh v. Lucas,37 F.2d 277 (9th Cir. 1930), and contends that it is entitled to use the cash method because it had consistently, fairly, and honestly kept its books using this method. Petitioner additionally argues that the cases on which respondent relies are contrary to the meaning and intent of section 446, and that inventory was not a material item in reflecting the income of Asphalt Products, Inc. Respondent, relying on his broad authority under section 446(b) to reject a method of accounting tha does not clearly reflect income, argues that Asphalt Products must switch to the accrual method of accounting. Respondent *511 maintains the accrual method is called for because inventory is a material income-producing factor in the business of petitioner Asphalt Products, and because business practices had changed so that as of 1974, the cash receipts and disbursements method of accounting did not clearly reflect petitioner's income. We agree with respondent that petitioner must change it method of accounting. Petitioner has used the cash method of accounting to report its income from the inception of its business. Petitioner argues that because respondent had no previous objections to the use of this method, it is entitled to continue its use. Where respondent has accepted a method of accounting over a long period of years, this fact is given weight in determining whether respondent was justified in changing the method used by such taxpayer. Ezo Products Co. v. Commissioner,37 T.C. 385, 391 (1961); Geometric Stamping Co. v. Commissioner,26 T.C. 301 (1956). It does not, however, preclude a determination that another method must now be used. The authority to order a change in accounting method where a longstanding method is in use depends on the validity of respondent's finding that a taxpayer's method *512 does not clearly reflect income. Ezo Products Co. v. Commissioner,supra;Glenn v. Kentucky Color & Chemical Co.,186 F.2d 975, 977 (6th Cir. 1951). Respondent has broad powers in determining whether an accounting method clearly reflects income, but has no authority to force a taxpayer to change from a method which does clearly reflect income to another method which in his opinion more clearly reflects income. Bay State Gas Co. v. Commissioner,75 T.C. 410, 417 (1980), affd. 689 F.2d 1 (1st Cir. 1982); Auburn Packing Co. v. Commissioner,60 T.C. 794, 800 (1973); Garth v. Commissioner,56 T.C. 610, 623 (1971). Thus the success of petitioner's contention that it is entitled to use the cash method turns on whether the cash method clearly reflects petitioner's income. For all years at issue, petitioner was in the business of manufacturing and selling asphalt and asphalt products and performed some paving work via its contracting business.Corporate books show balances reflecting inventories and accounts receivable. It is evident under the facts of this case that the production, purchase and sale of emulsified asphalt is an income-producing factor in petitioner's business and, therefore, *513 that merchandise on hand, including oil byproducts and other raw materials, must be taken into account in computing the taxable inocme of petitioner. See sec. 1.446-1(c)(2)(i), Income Tax Regs.
During the years at issue, petitioner of necessity maintained inventories of the raw materials used in its asphalt emulsion business. Because it was necessary to maintain inventories, petitioner's income could not be clearly reflected by the use of the cash method.Inventory is a material income-producing factor in petitioner's business. [13] Furthermore, the fluctuation in accounts receivable is substantial in relation to petitioner's income. See Ezo Products Co. v. Commissioner,37 T.C. at 392. We think the evidence in the record is sufficient to show that respondent's determination that the cash receipts and disbursements method does not clearly reflect petitioner's income is not clearly arbitrary or unreasonable. Accordingly, we are compelled to find that respondent did not abuse his discretion in arriving at his conclusion. Thor Power Tool Co. v. Commissioner,439 U.S. at 532-533. Furthermore, there was no showing of respondent's active acceptance of a past method of accounting in the *514 present case and, therefore, the factual situation in Magnon v. Commissioner,73 T.C. 980 (1980), is distinguishable. The "fair and honest" standard of Osterloh v. Lucas,supra, is similarly inapplicable in the present case. The test in Osterloh v. Lucas has been narrowed by code changes and by new regulations and does not apply where the production, purchase, or sale of merchandise is an income-producing factor and where it has been determined that income is not clearly reflected in petitioner's method. [14] We hold, therefore, that petitioner must change its method of accounting to an accrual method. III. Issues 3, 4, and 5 - Medical Plan
Section 105(a) provides that amounts received by employees under accident and health plans, to the extent attributable to employer contributions, generally are includable in gross income. [15]Section 105(b) carves *515 out an exception to this general rule for amounts "paid, directly or indirectly, to the taxpayer to reimburse the taxpayer for expenses incurred by him for the medical care * * * of the taxpayer, his spouse, and his dependents * * *." Section 105(e) specifically provides that "amounts received under an accident or health plan for employees * * * shall be treated as amounts received through accident or health insurance." [16] *516 When payments are properly excludable from an employee's income because they are made under a "plan for employees," they are deductible by the employer as ordinary and necessary business expenses under section 162(a). See sec. 1.162-10(a), Income Tax Regs. *517 Furthermore, even when medical payments are not excludable from an employee's income under section 105, they may still be deductible by the employer under section 162(a)(1) as reasonable compensation expenses. See American Foundry v. Commissioner,59 T.C. 231, 243-245 (1972), affd. in part and revd. in part, 536 F.2d 289 (9th Cir. 1976). Petitioners Asphalt Products, Clark, and William contend that all medical benefits and insurance payments were made under a qualified unwritten plan for all employees and a qualified written plan for officer-employees, and maintain that no payments were made to shareholders other than in their capacities as key employees of Asphalt. Alternatively, petitioners contend that if the payments for James were taxable, they were taxable as reasonable compensation income to James, and not as constructive dividends to Clark or William. Respondent contends that the various medical payments made by Asphalt were not made pursuant to a qualified plan because no unwritten plan existed covering all employees and the written plan by itself was discriminatory.Furthermore, respondent maintains that the amounts distributed to the officer-shareholders did not constitute *518 reasonable compensation. Consequently, respondent denies Asphalt Products any deductions and imposes on Clark and William added income either in the form of constructive dividends or as increased compensation. We agree with the petitioners and characterize the medical payment made by Asphalt Products as qualified payments under section 105, not includable in the income of the recipients, and deductible by the employer under section 162. It is clear that a plan as defined in section 1.105-5(a), Income Tax Regs., existed when James, Clark, and William received medical benefits from Asphalt Products. In addition to the group medical insurance policy, there ws an unwritten plan covering all employees. From the testimony and evidence in the record, it is clear that the existence of this plan was known to all employees. The medical expenses of company employees, although usually covered in full by the group policy, were covered by Asphalt Products when in excess of the $5,000 maximum group limit. The former payroll and bookkeeping secretary of Asphalt Products testified that Asphalt Products had paid all medical expenses in the one case during her tenure where expenses exceeded the *519 goupt limit. She also testified that Asphalt Products and never refused to pay any employee medical expense. Clark also testified that it was the policy of Asphalt Products to pick up any difference between actual expenses and the amount paid by insurance. A written plan also existed covering the corporate officers. Payments under this plan were not made on an arbitrary or ad hoc basis. Compare Larkin v. Commissioner,48 T.C. 629 (1967), affd. 394 F.2d 494 (1st Cir. 1968), and Lang v. Commissioner,41 T.C. 352 (1963), with Giberson v. Commissioner,T.C. Memo. 1982-338, and Bogene, Inc. v. Commissioner,T.C. Memo. 1968-147. At the time the plan was adopted, the corporate officers were James, Clark, and William. The question of whether the plan was "for employees" depends upon whether the plan is "truthfully described by the labels which the parties have attached to them." See Graybar Electric Co. v. Commissioner,29 T.C. 818, 832 (1958), affd. per curiam 267 F.2d 403 (2d Cir. 1959). [17] The plan in question provided benefits to James, Clark, and William, and their dependents, as employees of Asphalt Products. Plans limited to corporate officers who are also shareholders are not *520 per se disqualified under section 105(b). See Larkin v. Commissioner,48 T.C. at 635 n.5. [18]
As petitioners correctly argue, the plans offered by Asphalt Products were very similar to those in Bogene, Inc. v. Commissioner,supra, where medical benefits were provided to principal officer-employees of a corporation in addition to benefits provided under another plan which benefited all employees. The Asphalt Products plan did fix limits of the benefits in that all expenses would be reimbursed. Although Cark and William each ehdl 50 percent of the Asphalt Products stock through the Globe Partnership, there was no relationship between *521 their shareholder status and the amount of benefits to be paid. Clark, William, and James each played a key role in Asphalt Products by virtue of their training, experience, and management capabilities. It is clear that the genesis of the plan was the employee relationship rather than shareholder status and thus a rational basis other than ownership of the business existed to justify discrimination among different classes of employees. See Levine v. Commissioner,50 T.C. 422, 427 (1968); sec. 1.105-5(a), Income Tax Regs.[19] *522 We cannot accept respondent's characterization of the medical reimbursements to petitioners as distributions of corporate dividends. On the basis of the record before us, we conclude that medical payments to or for the benefit of petitioners James, Clark, and William were made under a plan for employees and not for shareholders. Accordingly, during the years at issue, the amounts received by the petitioners under the plan are excludable under section 105(b). We conclude that the expenditures made by Asphalt Products under its "plan for employees" were ordinary and necessary. Consequently, petitioner Asphalt Products is entitled to a deduction for medical payments as ordinary and necessary business expenses under section 162(a). IV. Issues 6 and 7 - Bargain Rental and Sale of Residence
A shareholder or employee realizes an economic benefit taxable as income by the use of corporate assets for less than adequate payment in money or money's worth. Section 61; Commissioner v. Smith,324 U.S. 177, 181 (1945); International Artists,Ltd. v. Commissioner,55 T.C. 94, 105 (1970); Dean v. Commissioner,9 T.C. 256 (1947); Frueauff v. Commissioner,30 B.T.A. 449 (1934). See also Commissioner v. Glenshaw Glass Co.,348 U.S. 426 (1955); Greenspun v. Commissioner,72 T.C. 931, 947 (1979), affd. 670 F.2d 123 (9th Cir. 1982). Section 301 provides that a distribution made by a corporation to a shareholder with respect to its stock shall be included in gross income to the extent it is a dividend (as defined in section 316). Section 316 defines a dividend as a distribution of property made by a corporation to its shareholders out of *523 its earnings and profits. Property is defined in section 317 to include "money, securities, and any other property." Section 1.301-1(j), Income Tax Regs. provides, in part, that: If property is transferred by a corporation to a shareholder which is not a corporation for an amount less than its fair market value in a sale or exchange, such shareholder shall be treated as having received a distribution to which section 301 applies. In such case, the amount of the distribution shall be the difference between the amount paid for the property and its fair market value. * * * Thus, although income generally is not realized by the purchaser when property is sold for less than its fair market value, a bargain sale by a corporation to a shareholder results in a dividend to the shareholder to the extent that the fair market value of property received exceeds the consideration paid. Commissioner v. Gordon,391 U.S. 83, 89-90 (1968); Honigman v. Commissioner,55 T.C. 1067, 1077 (1971), affd. on this issue 466 F.2d 69, 74 (6th Cir. 1972); Lacy v. Commissioner,39 T.C. 1100 (1963), affd. 341 F.2d 54 (10th Cir. 1965); Dellinger v. Commissioner,32 T.C. 1178, 1182 (1959). Whether the transfer *524 or sale of property to the shareholder constitutes a dividend is determined by the circumstances and actual effect of a transaction, and not by the intent of the parties. Palmer v. Commissioner,302 U.S. 63 (1937); Dellinger v. Commissioner,supra.[20] The dispute with regard to the Harding Place residence may be summarized as follows: (1) whether the rental to James and Estelle at below fair market value resulted in (a) income to them in the amount determined by respondent, or (b) income to William and Clark by virtue of their relationship to James and Estelle; (2) whether the subsequent sale of the residence by Asphalt Products to Estelle was (a) performed pursuant to a bona fide option and if so, (b) whether the option contract was capable of valuation at the time made, or (c) alternatively, if no option of economic substance existed, whether the bargain sale resulted in income taxable to Estelle, or (d) in constructive dividends taxable to William and Clark. Petitioners argue that Globe granted James and Estelle a binding option for consideration at a price reflecting the fair market value *525 of the property at the time the option contract was formed. After casting the transaction in this light, petitioners contend that under Palmer v. Commissioner,supra, an employee or shareholder is not taxable on the grant or exercise of an option when fair consideration is given in exchange for the option, even when the value of the property has increased by the time the option is exercised. Alternatively, petitioners assert that the difference between fair rental and sale value and the actual prices paid, if taxable, constituted additional compensation to James for his services to Globe, and did not represent dividend income to Clark and William. Respondent determined the fair rental value of the Harding Place property was $375 per month in 1976 and its fair market value in 1976 was $43,000.Respondent argues that William and Clark realized constructive dividends during 1974, 1975, and 1976 in the amount of the difference between fair rental value and the amounts paid and that William and Clark also received a constructive dividend when the property was sold to Estelle in the amount of the difference between fair market value and the amount paid. Respondent contends that William *526 and Clark were using their corporation to pay their personal expenses of caring for their parents and must realize constructive dividends represented by the amount of the bargain. Respondent asserts that there was no economic substance to the 1959 option agreement, no indication that the parties intended the option to constitute compensation for James' services, and no business purpose to the transaction. Respondent alternatively maintains that if an option existed, it had no ascertainable value when granted and therefore is taxable when exercised under the "open transaction" doctrine of Burnet v. Logan,283 U.S. 404 (1931). Respondent finally argues that if we find the transactions do not give rise to constructive dividends to William and Clark, they give rise to income to James and Estelle under section 61. We agree with petitioners and respondent to the extent they argue that the Harding Place residence transactions are taxable to James and Estelle as compensation under section 61. As respondent correctly argues, the "option" given by Globe to James and Estelle was not an effective option contract. It was not signed by James and Estelle, and there is no evidence that the requirement *527 of "fair consideration" was met, other than the recitation that such was given in the document. Although petitioners argue that the lease payments and agreement to maintain the property were valuable consideration, they offered no evidence to show that the payments of $100 per month were above a fair rental value in 1959, and thus, that a portion of such payments constituted fair consideration. In any event, the petitioners' contentions are not sufficient to overcome the presumption of invalidity of such contracts attendant in transactions between persons in fiduciary or confidential relationships. [21] Cf. Palmer v. Commissioner,supra;Dellinger v. Commissioner,32 T.C. at 1182. Respondent argues that the living expenses of James and Estelle were personal expenses of William and Clark, and that William and Clark as the officers and shareholders of Globe were *528 using the corporate form to derive economic benefit while avoiding taxable dividends. Petitioner argue that James was a valuable employee of Globe and the rental of the Harding Place residence was a benefit to him as an employee and not given as a result of the family relationship between James and the officer-shareholders, William and Clark. After considering the record in the present case, we find that William and Clark did not receive constructive dividends in the Harding Place residence transactions. See Palmer v. Commissioner,supra;Dellinger v. Commissioner,supra;L. Schepp Co. v. Commissioner,25 B.T.A. 419, 429 (1932). The record shows that James was a uniquely valuable officer-employee of Globe, and later, of Asphalt Products. Several witnesses who were business associates of Asphalt Products, including county highway supervisors and a road commissioner, testified that James was one of the most respected authorities in the road paving and highway construction business. William testified that James was known as "the father of the highway departments" of Tennessee. James' association with Asphalt Products boosted company business considerably. We think it is clear that *529 James was made an officer of the Globe company for reasons other than family considerations, and we think it is also plain that the rental of the house and bargain sale were a reasonable form of compensation for James' services. [22]
The economic benefit received by James and Estelle from the rental and sale of the Harding Place residence is taxable as compensation under section 61. Petitioners have not shown that the fair rental value of the house for the years at issue was other than that determined by the respondent and we find that the difference between $375 per month and the $100 per month paid by James and Estelle is taxable to James as compensation under section 61. [23] *530 Rule 142(a); Frueauff v. Commissioner,supra.We also find that the 1976 fair market value of the Harding Place residence was $43,000. The difference between this amount and the amount paid by Estelle is taxable as compensation income for James' services to the corporation. [24]Greenspun v. Commissioner,supra. V. Issue 8 - Section 6653(a) Negligence Additions
In his notice of deficiency, respondent determined additions to tax under section 6653(a) against petitioner Asphalt Products for the taxable years 1974 and 1975. On reply brief, respondent conceded that petitioner was not liable for the additions to tax for 1975 in the amount of $357.60. Section 6653(a) provides for an addition to tax if "any part *531 of any underpayment * * * of any [income] tax * * * is due to negligence or intentional disregard of rules or regulations." Petitioners bear the burden of proving that the additions to tax do not apply. Luman v. Commissioner,79 T.C. 846, 860-861 (1982); Bixby v. Commissioner,58 T.C. 757, 791 (1972); Rule 142(a). Respondent alleges that petitioner was negligent by accounting for its income on the cash method and because it deducted $1,103.04 in expenditures in connection with transporting two wastewater treatment plants from California to Nashville, Tennessee.[25] Petitioner denies negligence with respect to its method of accounting and asserts that its deductions with respect to the wastewater plant transportation were reasonable and do not indicate negligence. Petitioner has shown good faith reliance on the advice *532 of its accountant with respect to the choice of accounting method. Asphalt Products has shown that the advise of its accountant was based on all the facts and it is not liable for additions to tax on this account. Conlorez Corp. v. Commissioner,51 T.C. 467 (1968); Woodbury v. Commissioner,49 T.C. 180 (1967); see Leonhart v. Commissioner,414 F.2d 749 (4th Cir. 1969), affg. a Memorandum Opinion of this Court.Petitioner has not established, however, that the expense of $1,103.04 with respect to the transportation of the plants was other than a personal expense of William and Clark and thus it is liable for the section 6653(a) addition to tax as a result of this adjustment. [26] *533 Due to concessions, Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: William B. Akers and Jo Ann Akers, docket Nos. 6729-77, 6759-78, 5876-80; Estate of James C. Akers, Estelle L. Akers, Executrix and Estelle L. Akers, docket No. 5874-80; and Asphalt Products Company, Inc., docket Nos. 6758-78 and 5873-80.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue and all references to Rules are to the Tax Court Rules of Practice and Procedure.
3. J. Clark Akers, III concedes the adjustment to income for the taxable years 1967 through 1970 set forth as adjustment (a) in the statutory notice dated March 31, 1977 in the amounts of $269.74, $4,483.17, $6,340.03, and $5,420.02 for the years 1967 through 1970, respectively. For the taxable years 1974 and 1975, with respect to the statutory notice dated March 23, 1978, he concedes: (1) the adjustment set forth as adjustment (c) in the amounts of $1,345 for 1974 and $1,329 for 1975; (2) the adjustment set forth as adjustment (d) in part, in the amounts of $495.75 for 1974 and $1,960 for 1975; and (3) the adjustment marked as adjustment (e) for 1974 in the amount of $3,429.28. For the taxable year 1976, with respect to the statutory notice dated January 25, 1980, J. Clark Akers, III concedes adjustment (d) in the amount of $298 and adjustment (e) in the amount of $732. William B. Akers concedes the adjustment to income set forth as adjustment (a) in the statutory notice dated March 31, 1977 in the amounts of $269.74, $4,481.64, $6,315.03, and $5,385.02 for the years 1967 through 1970, respectively. For the taxable years 1974 and 1975, with respect to the statutory notice dated March 23, 1978, he concedes: (1) a portion of adjustment (c) for 1975 in the amount of $1,960; (2) adjustment (d) in the amounts of $515 for 1974 and $900 for 1975, and (3) adjustment (e) in the amount of $2,176.50 for 1974. For the taxable year 1976, with respect to the statutory notice dated February 7, 1980, he concedes adjustment (e) in the amount of $1,740 and adjustment (f) in the amount of $732. For the taxable year 1974, with respect to the notice of deficiency dated March 23, 1978, Asphalt Products Company, Inc. concedes adjustment (f) in the amount of $1,103.04. With respect to the statutory notice for 1976 dated January 25, 1980, Asphalt Products Company, Inc., concedes adjustment (f) in the amount of $298.50 and adjustment (g) in the amount of $213.49. With respect to these statutory notices, respondent and Asphalt Products Company, Inc. have agreed to compromise the adjustment marked as adjustment (b) with respect to travel and entertainment expenses for the years 1974 through 1976 as follows: 1974, $7,065.38; 1975, $6,293.27; 1976, $5,096.58. For the taxable years 1974 through 1976, with respect to the statutory notices dated March 23, 1978, January 25, 1980, and February 7, 1980 for both J. Clark Akers, III and William B. Akers, respondent concedes the portion of the adjustments relating to dividend income for salary paid the petitioners' father in the following amounts in each statutory notice: $5,760 for 1974; $5,400 for 1975; and $10,800 for 1976. With respect to the statutory notices dated March 23, 1978 (adjustment (c)) and January 25, 1980 (adjustments (d) and (e)), respondent concedes that the salary paid to James C. Akers, Jr. during 1974, 1975, and 1976 is deductible by Asphalt Products Company, Inc. in the following amounts: $11,520 for 1974; $10,800 for 1975; and $10,800 for 1976.↩
4. The amount borrowed from Pathfinder is not evident from the record in this case.↩
5. Specifically, the plants were used to determine the feasibility of wastewater nitrification in a single stage activated sludge system to obtain effluent NH[3]-N concentrations of less than 5 mg/1. The results of the pilot plant studies verified certain design parameters such as organic loading rates, solid productions, and oxygen requirements.↩
6. At the time, Vanderbilt University had an extensive environmental engineering program. The Center for Environmental Quality Management was an organization within Vanderbilt that encompassed a number of departments. The EPA grant was obtained through this Center. ↩
7. In full, the "monitor" was called a "Biological Simulation Monitor for a Joint Municipal/Industrial Treatment System."↩
8. We include a description of the various branches of the business of Asphalt Products only insofar as is relevant to the issues under our consideration.
9. For more details, see the facts in section II, supra.↩
10. This date, although in conflict with the stipulated date, is the effective date appearing on the policy.↩
*. Includes death benefit payment to Estelle L. Akers of $3,600↩
11. In finding an examination of other methods of valuation warranted, we also find the present valuation clearly distinguishable from the circumstances surrounding the sales in Hotel de France Co. v. Commissioner,1 B.T.A. 28 (1924) and Stollwerck Chocolate Co. v. Commissioner,4 B.T.A. 467↩ (1926) which respondent cites as support for his "bid price" argument.
12. In arriving at this conclusion, we note as we often do in such cases that this Solomonlike pronouncement was made as we attempted to carve out the facets of a diamone with only a sledgehammer for a tool. See, e.g., Messing v. Commissioner,48 T.C. 502, 512↩ (1967).
13. The presence of temporary inventory "blips" and higher accounts receivable than in pre-1974 years indicates that the underlying nature of petitioner's business has changed from the earlier, less volatile and less inflationary years. ↩
14. See Wilkinson-Beane, Inc. v. Commissioner,T.C. Memo. 1969-79, affd. 420 F.2d 352↩ (1st Cir. 1970).
15. Section 105(a) provides: Amounts Attributable to Employer Contributions.-Except as otherwise provided in this section, amounts received by an employee through accident or health insurance for personal injuries or sickness shall be included in gross income to the extent such amounts (1) are attributable to contributions by the employer which were not includible in the gross income of the employee, or (2) are paid by the employer. ↩
16. The following guidelines for defining an accident and health plan are presented in sec. 1.105-5(a), Income Tax Regs.: * * * In general, an accident or health plan is an arrangement for the payment of amounts to employees in the event of personal injuries or sickness. A plan may cover one or more employees, and there may be different plans for different employees or classes of employees. An accident or health plan may be either insured or non-insured, and it is not necessary that the plan be in writing or that the employee's rights to benefits under the plan be enforceable. However, if the employee's rights are not enforceable, an amount will be deemed to be received under a plan only if, on the date the employee became sick or injured, the employee was covered by a plan (or a program, policy, or custom having the effect of a plan) providing for the payment of amounts to the employee in the event of personal injuries or sickness, and notice or knowledge of such plan was reasonably available to the employee. It is immaterial who makes payment of the benefits provided by the plan. For example, payment may be made by the employer, a welfare fund, a State sickness or disability benefits fund, an association of employers or employees, or by an insurance company.
17. See Bogene, Inc. v. Commissioner,T.C. Memo. 1968-147↩. 18. The legislative history of section 105 has been sufficiently discussed in our previous opinions. See, e.g., Bogene, Inc. v. Commissioner,supra.It suffices for the purposes of this opinion for us to note that officer-employees may be covered to the exclusion of other employees in a qualified plan. See also American Foundry v. Commissioner,59 T.C. 231, 242 (1972); Epstein v. Commissioner,T.C. Memo. 1972-53; Smith v. Commissioner,T.C. Memo. 1970-243; Snyder v. Commissioner,T.C. Memo. 1983-692↩.
19. See Wigutow v. Commissioner,T.C. Memo. 1983-620. We draw no conclusion as to whether the plan would satisfy the nondiscrimination requirement of section 105(h) in effect for claims filed and paid after December 31, 1979.
20. See Nelson v. Commissioner,T.C. Memo. 1982-361↩, on appeal (10th Cir., Feb. 2, 1983).
21. Cf. Gordon v. Thornton,584 S.W.2d 655 (Tenn. App. 1979). Because we find that no option existed, we need not reach the issue of whether the transaction was taxable at the time the "option" paper was signed or when the Harding Place property was sold to Estelle. See Baumer v. United States,580 F.2d 863↩ (5th Cir. 1978).
22. We recognize that Estelle made the actual purchase; however, on the record before us, we conclude that the price was set as a result of James' services to the corporation.↩
23. Section 61, which defines gross income as "all income from whatever source derived," unless otherwise specifically exempted is broadly interpreted and encompasses in taxable income any economic or financial benefit conferred on an employee as compensation, whatever the form or mode by which it is effected. Commissioner v. Smith,324 U.S. 177, 181 (1945); Greenspun v. Commissioner,72 T.C. at 946-947; see also Helvering v. Bruun,309 U.S. 461 (1940); Commissioner v. Glenshal Glass Co.,348 U.S. 426↩ (1958); H.Rept. 1337, 83d Cong., 2d Sess. A18 (1954); S.Rept. 1622, 83d Cong., 2d Sess. 168 (1954). 24. The parties did not raise the applicability of section 83 to the Harding Place residence transactions.↩
25. As stated in Footnote 3, supra,↩ petitioner conceded that this amount, representing truckdriver salary of $399.51 and expense reimbursement of $703.53 was not properly deductible. Although on brief, petitioner states that this amount is, after all, properly deductible, justice does not require us to consider the stipulation to be without binding effect. See Rule 91(e).
26. We have held that the deduction by a corporation of personal expenditures as business expenses is clearly negligence. Finney v. Commissioner,T.C. Memo. 1980-23. Asphalt Products has stipulated to the nondeductibility of $1,103.04 in connection with the transportation of the plants from California to Tennessee. To the extent petitioners William and Clark in Docket Nos. 6759-78 and 6734-78, respectively, still maintain they are not taxable on the benefit received by them from their corporation, we find that they have each received constructive dividends in the amount of $551.52 as determined by respondent. See Rule 142(a). Petitioners William and Clark on petition raise an issue in Docket Nos. 6717-77, 6729-77, 6734-78, and 6759-78 relating to the characterization of coal royalties paid as ordinary business deductions or as reductions of coal royalties received under sections 631 and 1231. Both petitioners and respondent agree that all stipulations of fact in Davis v. Commissioner,74 T.C. 881 (1980), on appeal (6th Cir., Feb. 17, 1981; 9th Cir., Mar. 20, 1981), as that case relates to these common issues are to be taken as fact in this action. They had also agreed to be bound by the final determination of the Sixth Circuit Court of Appeals or the United States Supreme Court in Davis if a are determination of the Sixth Circuit or the United States Supreme Court became final prior to this opinion. We conclude that Davis v. Commissioner,supra,↩ controls petitioners' situation and we are bound by our decisions therein.