ESTATE OF HOMER O. ENGLISH, DECEASED, DONALD E. CHAPIN, PERSONAL REPRESENTATIVE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of English v. Commissioner
Docket No. 12178-83.
United States Tax Court
T.C. Memo 1985-549; 1985 Tax Ct. Memo LEXIS 84; 50 T.C.M. (CCH) 1362; T.C.M. (RIA) 85549; October 31, 1985. John N. McNamara, Jr. and Linda J. Whitaker, for the petitioner. Mark H. Howard, for the respondent. SWIFT
MEMORANDUM FINDINGS OF FACT AND OPINION SWIFT, Judge: In a statutory notice dated February 22, 1983, respondent determined a deficiency of $260,293 in petitioner's Federal estate tax liability. Following concessions by the parties, the issues remaining for decision pertain to the fair market value of various parcels of real estate located near Casper, Wyoming, on June 15, 1979, the date of decedent's death. FINDINGS OF FACT Some of *86 the facts have been stipulated and are found accordingly. The decedent, Homer O. English, died on June 15, 1979, a resident of Casper, Wyoming. A Federal estate tax return was filed on behalf of the estate with the Internal Revenue Service on February 22, 1980. Amended Federal estate tax returns were filed on April 16, 1980, and April 18, 1980. For a number of years before his death, decedent experienced very poor health. He had suffered two heart attacks and had lost his speech by May of 1979. The cause of his death was a third heart attack. Throughout his life, decedent was engaged in real estate investment and development. In 1949, decedent acquired 160 acres of property located near Casper, Wyoming. This property was known as the Wyoming Industrial Park. Decedent commenced development of the property in the early 1950's. The property was first platted in the early 1960's, and the present replatting was done in 1976. For purposes of discussing that portion of the Wyoming Industrial Park property that still was owned by decedent at or near and time of his death, that property can be divided into two types of property. The first type consisted of 30 separate lots *87 into which a large portion of the Wyoming Industrial Park property had been subdivided. The second type consisted of a single 39.5-acre tract of land that had not been subdivided as of decedent's death. We will first discuss the 30 subdivided lots, followed by a discussion of the 39.5-acre tract. 30 Subdivided Lots
In early 1969 decedent owned 30 subdivided lots in the Wyoming Industrial Park. As of 1979, the subdivided lots provided access to all utilities (including sewer, water, and electricity). Gravel streets were constructed and in use throughout the subdivided lots. An improvement district was established in the area in 1980, and in that year the streets were paved, and curbs, gutters, and storm sewers were installed. From 1964 through 1973, the annual sales of subdivided lots averaged approximately 506,000 square feet per year, but fell to only 180,000 square feet per year from 1974 through 1979. By 1979, nearly 60 percent of the subdivided lots, including many of the more desirable ones, had been sold. Because of the easy access to U.S. Highways 20 and 26, via Rancho Road, the subdivided lots in the Wyoming Industrial Park that front on Rancho Road typically *88 were leased or purchased as property on which commercial retail businesses such as gas stations and restaurants would be located. Light industrial businesses such as warehousing companies and wholesale distributors tended to locate on the lots not fronting on Rancho Road. On May 22, 1979, decedent entered into a contract to sell 25 of the subdivided lots to his son and daughter.The purchase price stated in the sales contract was $1,204,903, which was calculated on the basis of a total square footage for the property of 803,269 square feet at $1.50 per square foot. [1] Under the sales contract between decedent and his son and daughter, no cash down payment was required. The entire purchase price of $1,204.903 was reflected in a note signed by decedent's son and daughter under which the $1,204,903 was to be paid in 10 annual installments commencing one year later, i.e. on May 22, 1980. Interest at six percent per year was to accrue on the unpaid principal. Each of the first nine payments on the note were to be in the amount of $105,049 (including interest), and the last payment was to be in an amount necessary to pay off the principal and interest then due on the note. The 25 lots *89 were zoned for development as light industrial or low-class commercial property. On May 25, 1979, three days after the sale of the 25 lots to his son and daughter, decedent conveyed as gifts to his son and daughter four of the five remaining subdivided lots in the Wyoming Industrial Park which he still owned. The four lots given to his children were unimproved, and were similar in all respects to the other 25 subdivided lots previously described. They also were zoned for development as light industrial or low-class commercial property and had the same improvements and access to utilities as the 25 subdivided lots. The last of the 30 subdivided lots at issue in this case was neither sold nor given to decedent's children but was owned by decedent at the time of his death. That lot was Lot 10A, Block 7, of the Wyoming Industrial Park, a small triangular shaped parcel upon which a small, old *90 log cabin was located. The parcel borders a highway and proposed streets on two sides. All public utilities were available to this site, but due to its small size (2,726 square feet), development of the lot by itself was unlikely. 39.5-Acre Tract
The 39.5-acre tract of land in the Wyoming Industrial Park consisted of a single parcel of raw, unimproved land located adjacent to the subdivided lots in the Wyoming Industrial Park. The 39.5 acres were not subdivided, although the property had been surveyed and platted for subdivision approval.The terrain was sloped only slightly and had a heavy cover of dust on the surface of the property. The entire 39.5 acres had excellent potential access to two major highways. The parties agree that the highest and best use of the 39.5-acre tract in 1979 was simply to hold it in its unimproved condition as an investment until further development had occurred of the subdivided lots in the Wyoming Industrial Park and of other properties in the vicinity. OPINION The valuation issues involved herein arise under the provisions of sections 2033, 2035, and 2043. [2] *91 Section 2033 provides that the gross estate shall include the value of all property to the extent of a decedent's interest therein at the time of his death. Under that provision, the value of decedent's interests in the subdivided lots and in the 39.5-acre tract that were owned by decedent at the time of his death are included in decedent's gross estate. Also under section 2033, the fair market value of the $1,204,903 note that was received by decedent from his son and daughter (with respect to the sale of the 25 lots) must be included in this gross estate. As in effect for 1979, section 2035(a) generally required that the fair market value of property transferred by a decedent within three years of his death be included in decedent's gross estate. Pursuant to that section, the four lots that decedent conveyed as a gift to his two children on May 25, 1979, must be included in decedent's gross estate. *92 Under section 2035(b)(1), an exception to the general rule of section 2035(a) is provided and property transferred within three years of death will not be included in decedent's gross estate if the transfer was a "bona fide sale for an adequate and full consideration in money or money's worth." That provision ordinarily would require an analysis of whether the sale of the 25 lots by decedent to his children was (1) bona fide and (2) for an adequate and full consideration. Sec. 20.2043-1(a), Estate Tax Regs. [3] Although we have substantial doubts as to whether the sale was at arm's length and bona fide, we do not need to address that issue in light of our conclusion (discussed further herein) that the fair market value of the 25 lots exceeded by a significant amount the fair market value (at the date of decedent's death) of the $1,204,903 note (namely $639,000 [4]). That finding establishes that decedent's son and daughter did not pay an adequate and full consideration for the 25 lots and that the difference between the fair market value of the 25 acres and $639,000, the value of the note, must be included in decedent's gross estate. *93 Therefore, the issue in this case with regard to the 25 lots sold to decedent's children on May 22, 1979, boils down simply to a determination of the fair market value of the 25 lots and to a mathematical calculation of the difference between that value and the $639,000 value of the note, which calculation the parties can make as part of the computation under Rule 155, Tax Court Rules of Practice and Procedure.
*94 In summary, we must decide herein the fair market value of (1) the 25 lots decedent sold to his children on May 22, 1979; (2) the four lots decedent conveyed to his children by gift on May 25, 1979; and (3) the one lot and the 39.5-acre tract which decedent still owned on the date of his death. For purposes of these valuation issues, the parties agree that June 15, 1979, the date of death, may be used as the relevant valuation date for each of the properties to be valued. We now proceed to discuss the relevant legal criteria for the valuation of property and the respective contentions of the parties before explaining our conclusions as to the value of the properties in question. The fair market value of property is defined as the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts. Sec. 20.2031-1(b), Estate Tax Regs., United States v. Cartwright,411 U.S. 546, 551 (1973). *95 In determining fair market value, we are bound to consider all of the relevant facts and testimony. Anderson v. Commissioner,250 F.2d 242, 249 (5th Cir. 1957), affg. a Memorandum Opinion of the Court; see also Philadelphia Steel & Iron Corp. v. Commissioner,T.C. Memo. 1964-93, affd. per. curiam 344 F.2d 964 (3d Cir. 1965). The testimony of expert witnesses is not to be accepted as gospel, but is to be evaluated in light of the entire record in a case. Akers v. Commissioner,T.C. Memo. 1984-208847 T.C.M. 1621, 1632, 53 P-H Memo T.C. par. 84,208 at 84-788. As we have observed in the past, the valuation of property is an inexact science at best, and if not settled by the parties is capable of resolution by the courts only through "Solomon-like" pronouncements. Buffalo Tool & Die Mfg. Co. v. Commissioner,74 T.C. 441, 452 (1980); Messing v. Commissioner,48 T.C. 502, 512 (1967). The parties agree that the four lots within the Wyoming Industrial Park that decedent conveyed by gift to his children had the same value per square foot as the 25 lots decedent sold to his children. *96 Therefore, we will consider those four lots together with the 25 lots. Although employing slightly different terminology and differing as to the appropriate figures to be used, petitioner's and respondent's expert witnesses used the same three steps to arrive at their respective fair market values of the 29 subdivided lots. First, they determined an average sales price per square foot for the lots (based on comparable sales in the area in 1979) and multiplied the average sales price per square foot by the actual square footage of the lots to arrive at a total projected sales price. Second, they determined the number of years (referred to as the "absorption period") that, in their opinion, it would take to sell all of the lots and divided the total projected sales price by the number of years in the absorption period, thereby producing a projected average annual cash flow from hypothetical future sales of the lots. Third, to compute the value, as of decedent's death, of the projected annual cash flow they discounted that projected cash flow using what they determined was a market discount rate (namely, the rate of return that in their opinions would have been necessary to attract *97 hypothetical investors to these particular investments). The figure resulting from these three steps produced for each expert his estimate of the fair market value of the lots as of June 15, 1979. With respect to the first step, petitioner's expert contends, based upon his study of comparable sales in the area, that the appropriate sales price for the 29 lots would have been $1.50 per square foot. Respondent's expert contends that $1.81 per square foot would have been the appropriate sales price, based upon his study of comparable sales. The estimated sales price of petitioner's expert of $1.50 per square foot reflects a downward adjustment of 10 percent to allow for a real estate commission which necessarily would be incurred in selling the lots. Although respondent's expert acknowledged that real estate commissions of 10 percent were customarily incurred on the sale of land in the Casper area in 1979, his figure of $1.81 per square foot did not reflect such a commission. It seems to us that in making a present value calculation of a future cash flow, it is appropriate to take into *98 account selling expenses to determine the net cash proceeds that are projected to become available from a transaction. See Estate of Piper v. Commissioner,72 T.C. 1062, 1080-1081 (1979); Allison v. Commissioner,T.C. Memo. 1976-248, 35 T.C.M. 1069, 1078, 45 P-H Memo T.C. par. 76,248 at 76-1064. After the above adjustment is made to respondent's figure for the 10-percent real estate commission, the opinions of the two expert witnesses do not differ significantly with respect to the appropriate comparable sales price to be used in step one (namely, $1.50 per square foot according to petitioner's expert, and $1.63 per square foot according to respondent's expert). The difference in the two figures is primarily attributable to the fact that petitioner's expert omitted several of the higher-priced comparables from his study of comparable sales, without adequate explanation for those omissions.We conclude that $1.63 per square foot is the appropriate comparable sales figure to be used for purposes of step one. As explained, the second step requires the selection of the appropriate absorption period (namely, the time required to sell all of the 29 *99 separate lots at a fair market price).Petitioner's expert asserts that it would take 10 years. Respondent's expert asserts that it would take five years. Respondent's expert focuses almost exclusively on the frequency of lot sales made in the Wyoming Industrial Park over the entire 15-year period from 1964 to 1979. Although that sales record certainly should be accorded significant weight, there are other important factors to consider. By 1979, there were several other major industrial park subdivisions that had either just entered the market in Casper or were preparing to open within several years. They included Teton Terrace, Landmark Industrial Park, and Westgate Park IV, all of which were located in close proximity to the Wyoming Industrial Park. Many of the best lots in the Wyoming Industrial Park had been sold before 1979. In addition, the local Casper economy had entered a slight recession by 1979 which slowed the sales of real estate. By 1979, the rate of lot sales in the Wyoming Industrial Park already had fallen off from approximately 506,000 square feet per year during the period 1964 to 1973, to approximately 180,000 square feet per year during the period 1974 to *100 1979. We adopt 10 years as the proper absorption period. [5]
The third step in the determination of the fair market value of the 29 lots on the date of decedent's death is the selection of the appropriate market discount rate. The discount rate, as used herein, refers to the annual percentage rate of return hypothetical investors would require on their investments in order to attract them to purchase the 29 lots in lieu of other available investments.The rate of return is used to discount the expected cash flow arising from future sale of the lots over the 10-year absorption period, in order to calculate the amount that hypothetical investors would be willing to pay for the 29 lots on the valuation date. The two expert witnesses herein used different methods in order to arrive at the appropriate discount rate, both of which apparently *101 are accepted procedures within the real estate appraisal profession. Petitioner's expert used the so-called "build-up" method. Under this method, a "safe rate" is first selected, based upon the interest rate paid on government obligations such as a short-term Treasury bill. Petitioner's expert referred to the fact that an investor could have purchased a 182-day Treasury bill on June 25, 1979, which would have produced a yield of 9.4 percent. To that safe rate, various increments are added to compensate the investor for additional disadvantages of the proposed investment versus a safe investment such as a Treasury bill. In this case, petitioner's expert added approximately four percent to compensate the hypothetical investors for the additional risk and nonliquidity associated with the ownership of land. Petitioner's expert therefore concluded that 13.5 percent would be the appropriate discount rate. In his written report, petitioner's expert noted that "overall capitalization rates for properties similar to those contained in the English Estate are 12.0% to 13.5%." Petitioner's expert also asserts that the prime interest rate in June of 1979 was approximately 11.5 percent, and *102 that since real estate investors often borrow money to finance their investments, such investors would expect a rate of return higher than the interest rate they would have been required to pay to finance the investments. Respondent's expert used the so-called "extraction method" in arriving at a discount rate of 9 percent. He extracted or calculated that rate based on rates actually being realized on properties in the Casper area in 1979. The properties he used in his calculations of the nine-percent rate, however, were certain improved properties (principally, the lots on which the Texaco service station and the bar were located). We cannot agree that those two improved commercial properties were sufficiently comparable to the 29 unimproved lots. Having considered carefully the testimony and reports of the experts, we conclude that 12 percent is the appropriate discount rate to be used with respect to the 29 lots. The fair market value of the 29 lots on June 15, 1979, can now be calculated as follows. Utilizing the same methodology employed by the expert witnesses herein, but substituting the Court's conclusions with respect to the appropriate price per square foot ($1.63), *103 absorption period (10 years), and discount rate (12 percent per annum), our calculation is as follows: Square footage sales price ($1.63) times total square feet in 29 lots (941,700) equals total sales price ($1,534,971). Using a 10-year absorption period, the projected sales proceeds would be $153,497 annually for 10 years. Utilizing annuity tables and a discount rate of 12 percent, the present value of $1 paid annually for 10 years is 5.650 times the annual payment, or .5650 times the entire principal amount to be paid out over the 10-year period [6] (.5650 times $1,534,971 equals $867,258.62). Rounding the result, we conclude that the fair market value of the 29 lots was $867,300 on June 15, 1979. The next issue for consideration is the fair market value of lot 10A, Block 7. Petitioner's expert contends that the value of that parcel was $2,200 as of the date of decedent's death. Respondent's expert contends the value thereof was $5,000. Both expert witnesses agree that because *104 of its small size (only 2,726 square feet) and irregular shape, the only value this property had was in connection with the development of one of the adjoining lots. The expert witnesses also agree that the small log cabin located on the lot was of little or no value. Because the lot fronts on a highway and two streets, there appears to be only one adjoining landowner who might be interested in purchasing it. Given such a limited market, the potential purchaser would likely be able to obtain the small lot at a bargain price. Based on the foregoing facts, we conclude that the value of this parcel was $4,000 on June 15, 1979. The last issue for consideration is the fair market value of the 39.5-acre tract of unimproved land located adjacent to the Wyoming Industrial Park. Petitioner's expert witness asserts that the 39.5-acre tract had a fair market value of $12,000 per acre as of June 15, 1979, for a total value of $474,000. Respondent's expert contends that the value was $17,000 per acre, for a total value of $671,500. A point which supports the value suggested by respondent's expert is the fact that petitioner (through its authorized agents) reported a value of $760,000 *105 with respect to this tract on both the original and the amended Federal estate tax returns filed with the Internal Revenue Service. Those statements may properly be considered by the Court as admissions against interest, and we accord them some weight. McShain v. Commissioner,71 T.C. 998, 1010 (1979). Another factor that favors respondent's value is the fact that the 39.5-acre tract was located closer to the central business district of Casper, Wyoming, than the comparable properties examined by each expert witness (namely, approximately one mile versus two to five miles in the case of the closest comparables). Although petitioner's expert admitted on cross examination that the closer proximity of the subject tract to the central business district would make the land more valuable than the comparables he studied, he made no allowance for that factor in his calculations. Respondent's expert took that factor into account, along with the differences in size between the comparables and the subject property. [7]
*106 Petitioner makes a number of objections to respondent's expert's calculations regarding comparables, such as that he did not discount promissory notes received in several non-cash sales to reflect present values, that he considered an option as a comparable even though the option was not in fact exercised, and that he added the cost of demolishing a useless building to the actual sales price of one comparable. Although we agree with petitioner that respondent's expert's report does contain some errors, we believe that the problems pointed out are comparatively minor and that the greater weight of the evidence favors the value forwarded by respondent's expert. The sale which both experts agree is "highly comparable" to the 39.5-acre tract in terms of geographic location, terrain, appropriate use of the land, and proximity in time, is a cash sale which occurred in October of 1978, at a price of $15,345 per acre. We agree with the expert's opinions herein that the other so-called comparables differ significantly from the subject property in one respect or another, and we believe that some upward adjustment should be made to reflect that the 39.5 acre tract had a slightly better location *107 and access to utilities. Also, a slight downward adjustment should be made because the 39.5-acre tract is larger than the comparable (39.5 acres versus approximately 11.7 acres). We conclude, based on the foregoing factors and all of the evidence in the record, that the subject 39.5-acre tract of undeveloped land had a value of $16,000 per acre as of the date of decedent's death, for a total value of $632,000. In summary, we make the following conclusions with respect to the fair market value of the land at issue herein, as of June 15, 1979: Fair Market Value
[8] on June 15, 1979 29 Subdivided Lots
$867,300
Lot 10A, Block 7
4,000
39.5-Acre Tract
632,000
Accordingly, Decision will be entered under Rule 155.
Footnotes
1. The parties herein agree that the actual square footage of the 25 lots was 853,194, an inadvertent error having been made when the contract specified the lesser figure of 803,269 square feet. The $1,204,903 stated purchase price was, however, the intended sales price for all 25 lots.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the year involved.↩
3. Section 20.2043-1(a), Estate Tax Regs., provides, in pertinent part, as follows: Section 20.2043-1 Transfers for insufficient consideration--(a) In general. The transfers, trusts, interests, rights or powers enumerated and described in sections 2035 through 2038 and section 2041↩ are not subject to the Federal estate tax if made, created, exercised, or relinquished in a transaction which constituted a bona fide sale for an adequate and full consideration in money or money's worth. To constitute a bona fide sale for an adequate and full consideration in money or money's worth, the transfer must have been made in good faith, and the price must have been an adequate and full equivalent reducible to a money value. If the price was less than such a consideration, only the excess of the fair market value of the property (as of the applicable valuation date) over the price received by the decedent is included in ascertaining the value of his gross estate. 4. The only evidence in this case as to the value of the note indicated a value on the date of death of $639,000, which value we accept.↩
5. There is discussion in the briefs herein as to whether the Court may properly consider evidence as to the subsequent (post-1979) sales rate of lots in the Wyoming Industrial Park. We have reached our conclusions herein independently of such evidence. However, we note that the post-1979 sales support the finding of a 10-year absorption period.↩
6. See Financial Publishing Company, Financial Compound Interest and Annuity Tables 1797 (6th ed. 1980); David Thorndike, Thorndike's Compound Interest and Annuity Tables, Annual 5-10 (1982).↩
7. According to the experts, smaller parcels are generally considered more valuable per acre because they are more affordable to a greater number of investors than are larger parcels.↩
8. Our conclusions can be compared with the values for the properties as alleged by the parties at trial as follows: ↩
Petitioner
Respondent
29 Subdivided Lots
$751,000
$1,324,700
Lot 10A, Block 7
2,200
5,000
39.5-Acre Tract
474,000
671,500